Vaughn Fisher, ISB No. 7624
Rebecca A. Rainey, ISB No. 7525
Christopher F. Brown, ISB No. 9328
FISHER RAINEY HUDSON
950 W. Bannock St., Ste. 630
Boise, ID 83702
Telephone: (208) 345-7000
Facsimile: (208) 514-1900
vaughn@frhtriallawyers.com
rar@frhtriallawyers.com
chris@frhtriallawyers.com

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SHANIZ WEST, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF CALDWELL; CITY OF CALDWELL POLICE DEPARTMENT; FORMER CHIEF CHRIS ALLGOOD in his official and individual capacity; SERGEANT DOUG WINFIELD in his official and individual capacity; LIEUTENANT ALAN SEEVERS in his official and individual capacity; OFFICER MATTHEW RICHARDSON in his official and individual capacity and DOES I-X,<br><br>Defendants. | Case No.: 1:16-cv-359<br><br>**AFFIDAVIT OF REBECCA RAINEY IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. 33-1)** |

STATE OF IDAHO    )
                              ) ss
County of Ada        )

Rebecca A. Rainey, being first duly sworn deposes and says the following:

**AFFIDAVIT OF REBECCA RAINEY IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT- 1**

1.      I am over the age of 18 and competent to testify on the matters set forth herein.

2.      I am counsel for the Plaintiff in this matter.

3.      Attached hereto as **Exhibit A** is a true and correct copy of the relevant pages from the Deposition of Shaniz West, taken on  the 8th of February, 2017.

4.      Attached hereto as **Exhibit B** is a true and correct copy of the relevant pages from the Deposition of Joey Hoadley, dated the 16th of December, 2016.

5.      Attached hereto as **Exhibit C** is a true and correct copy of the relevant pages from the Deposition of Matt Richardson, dated the 3rd of January, 2017.

6.      Attached hereto as **Exhibit D** is a true and correct copy of the relevant pages from the Deposition of Alan Seevers, dated the 13th of December, 2016.

7.      Attached hereto as **Exhibit E** is a true and correct copy of the relevant pages from the Deposition of Doug Winfield, dated the 13th of December, 2016.

8.      Attached hereto as **Exhibit F** is a true and correct copy of the relevant pages from the Deposition of Chris Allgood, dated the 16th of December, 2016.

9.      Further your affiant sayeth naught.

Dated this 20nd day of May, 2017.

Rebecca A. Rainey

SUBSCRIBED AND SWORN to before me this 22 day of May, 2017.

STEFFANIE COY
Notary Public
State of Idaho

NOTARY PUBLIC FOR IDAHO
Residing at: Boise
My commission expires: March 28, 2020

**AFFIDAVIT OF REBECCA RAINEY IN SUPPORT OF PLAINTIFF'S**
**OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT- 2**

I HEREBY CERTIFY that on the 22nd day of May 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing and a copy of this document to the following persons:

Landon Brown – of the Firm
Attorney for Defendants
950 W. Bannock Street, Ste. 610
Boise, Idaho 83702
landon@naylorhales.com
(208) 383-9511

/s/ Rebecca A. Rainey
Attorney for Plaintiff

# EXHIBIT A

Page 1

1 IN THE UNITED STATES DISTRICT COURT
2 FOR THE DISTRICT OF IDAHO
3
4 ------------------ x  Case No.
    :  1:16-cv-00359-REB
5    :
    :
6 SHANIZ WEST, an individual,    :
    :
7        Plaintiff,    :
    :
8    vs.    :
    :
9 CITY OF CALDWELL; CITY OF CALDWELL  :
  POLICE DEPARTMENT; FORMER CHIEF CHRIS :
10 ALLGOOD in his official and  :
  individual capacity; SERGEANT DOUG  :
11 WINFIELD in his official and  :
  individual capacity; LIEUTENANT DEVIN :
12 RILEY in his official and individual  :
  capacity; and DOES I-X,    :
13    :
        Defendants.    :
14    :
  ------------------ x
15
16 DEPOSITION OF SHANIZ WEST
17 February 8, 2017
18
19 VOLUME 1
  Pages 1 - 169
20
21 Reported by
  Brooke R. Bohr
22 CSR No. 753
23
24
25

Page 2

1      DEPOSITION OF SHANIZ WEST, taken at the
2 instance of the Defendants, at the law offices of
3 NAYLOR & HALES, 950 W. Bannock Street, Suite 610,
4 in the City of Boise, State of Idaho, commencing
5 at 9:10 a.m., on February 8, 2017, before Brooke
6 R. Bohr, CSR, RPR, a Notary Public in and for the
7 State of Idaho, pursuant to notice, and in
8 accordance with the applicable Rules of Civil
9 Procedure.
10
11      A P P E A R A N C E S
12 FOR PLAINTIFF
    Jeremiah M. Hudson, Esq.
13    Christopher F. Brown, Esq.
    FISHER RAINEY HUDSON
14    950 W. Bannock St., Ste. 630
    Boise, ID 83702
15    (208) 345-7000
    jeremiah@frhtriallawyers.com
16    chris@frhtriallawyers.com
17 FOR DEFENDANTS
    Landon S. Brown, Esq.
18    Kirtlan G. Naylor, Esq.
    NAYLOR & HALES, PC
19    950 W. Bannock Street, Ste. 610
    Boise, Idaho 83702
20    (208) 383-9511
    landon@naylorhales.com
21
22
23
24
25

Page 3

1      W I T N E S S
2
3 SHANIZ WEST      Page:
4    Examination by Mr. Brown      4
5    Examination by Mr. Hudson      160
  Further Examination by Mr. Brown   162
6
7      * * * * *
8
9      E X H I B I T S
10      Page:
11 20   Caldwell Police Department      23
    Investigative Report
12
13 21   Damaged Property Inventory &   117
    Expenses
14 22   First Amended Complaint and   143
    Demand For Jury Trial
15
16 23   Plaintiff's Response to      144
    Defendants' First Set of
17    Interrogatories and Requests
    For Production of Documents
18
      * * * * *
19
20
21
22
23
24
25

Page 4

1 BOISE, IDAHO
2 February 8, 2017, 9:10 a.m.
3
4      SHANIZ WEST,
5 produced as a witness at the instance of the
6 Defendants, having been first duly sworn, was
7 examined and testified as follows:
8
9      EXAMINATION
10 BY MR. BROWN:
11    Q.  Okay.  Shaniz, do you understand you're
12 under oath and must testify truthfully today?
13    A.  Yes, I do.
14    Q.  Will you answer my questions honestly
15 to the best of your ability?
16    A.  Yes, I will.
17    Q.  And if you do not understand a question
18 I'm asking you, please let me know.
19    A.  Okay.
20    Q.  If you answer a question that I ask,
21 I'll assume that you understood the question.
22 Is that fair?
23    A.  Yes.
24    MR. NAYLOR:  Landon, does she have some
25 documents she brought?

Page 9

1  conversation.
2      A.  She asked me what the keys were for and
3  if there was a separate key for the back door, and
4  I told her that the same key worked on the back
5  door, as well, that I had provided them.
6      Q.  Is it true that you didn't want Fabian
7  Salinas in your home?
8      A.  Well, I was allowing him to grab his
9  belongings, and then I asked for him to leave
10 after he grabbed his belongings.  But I had to
11 leave, because I was in a short timeframe to get
12 my son registered for school and I had to walk.
13 So. . .
14     Q.  So the morning of August 11th, you
15 reported to police officers that there was
16 somebody knocking on your windows of your house,
17 correct?
18     A.  Yeah.  I was surprised by him showing
19 up because as far as I knew, he didn't know where
20 I lived.  That's how I wanted it to stay.  He was
21 there, so I was allowing him to grab his
22 belongings.
23     Q.  That morning when you talked to police
24 officers, you suspected it might be Fabian Salinas
25 knocking on your window that night?

Page 10

1      A.  Um-hum.  Yes.  Sorry.
2      Q.  In fact, you were scared it might be
3  him; is that right?
4      A.  Yes.
5      Q.  So is it fair to say you were scared of
6  Fabian Salinas and didn't want him to come to your
7  house?
8      A.  I wouldn't say I was scared of him.  I
9  just didn't want him at my house.
10     Q.  Okay.  And when Fabian came to your
11 home on August 11th, you were allowing him to
12 remove his belongings, but then you wanted him to
13 leave, correct?
14     A.  Yes.
15     Q.  At that time, were you aware that he
16 had felony warrants for his arrest?
17     A.  No.
18     Q.  Were you aware that he had any warrants
19 for his arrest?
20     A.  I knew that he had absconded his
21 probation, and that's as far as I knew, as far as
22 him being in trouble.
23     Q.  Nobody ever told you that he had any
24 warrants for his arrest at that time?
25     A.  No.  That's the only thing I knew of.

Page 11

1      Q.  And Crystal never told you anything
2  about that?
3      A.  No.
4      Q.  Why didn't you want Fabian Salinas to
5  remain in your home?
6      A.  We weren't together at the time, so I
7  didn't.  I knew that he was getting into bad
8  things, so I didn't want him at my home or around
9  my kids at the time.
10     Q.  What do you mean when you say you knew
11 he was "getting into bad things"?
12     A.  He was hanging around some known gang
13 members.  I could only assume the stuff he was
14 doing.
15     Q.  Do you believe he was committing
16 crimes?
17     A.  I'm not aware of what he was doing.  I
18 believe he was doing drugs.  That's what I didn't
19 want around my kids.
20     Q.  So at the time that he arrived at your
21 home on August 11th, were you aware that it was a
22 crime to harbor a known felon?
23     A.  I know what that charge -- I mean, I
24 know the seriousness of that charge, but I did not
25 know that he was a known -- well, wanted, I guess.

Page 12

1      Q.  When Officer Richardson approached you
2  on August 11th, he asked you if Salinas was in
3  your home, correct?
4      A.  Correct.
5      Q.  And he informed you that if Salinas was
6  in the home -- let me back up.  He informed you
7  that Fabian Salinas had arrest warrants, correct?
8      A.  Um-hum.  Yes.
9      Q.  He informed you if Salinas wasn't in
10 your home and you didn't tell him, you could get
11 in trouble, correct?
12     A.  Yes.
13     Q.  And you understood that, right?
14     A.  Yes.
15     Q.  And you decided to cooperate with
16 police officers and you told them that Fabian was
17 in the home, right?
18     MR. HUDSON:  Objection; foundation.
19     THE WITNESS:  Yes.  I -- my mom had been
20 previously convicted of harboring a fugitive, so I
21 knew the seriousness of that charge.  So once he
22 mentioned that, I felt like I was threatened, and
23 I felt like there was no -- I felt like I had to
24 say what I needed to say, and I had to cooperate
25 as much as possible.  So that's why I gave my keys

Page 17

```
 1      Q.   And they didn't use any gas, correct?
 2      A.   No.
 3      Q.   But they did have their guns drawn?
 4      A.   Yes, they did.
 5      Q.   And they put everybody in zip ties?
 6      A.   Yes, they did.
 7      Q.   Did they arrest anybody else besides
 8  Fabian Salinas and your mother?
 9      A.   My mom's boyfriend was there, as well,
10  but I don't think they arrested him.
11      Q.   And what's your mom's name?
12      A.   Linda West.
13      Q.   And where were you living at this time?
14      A.   I was living in Caldwell, Idaho.
15      Q.   It was not the same residence that
16  you --
17      A.   No, it was not.
18      Q.   Okay.  And so back to August 11, 2014,
19  did you want Fabian Salinas arrested?
20      A.   I wouldn't say that I wanted him to be
21  arrested.  But if he had gotten into some trouble,
22  then, you know, he needs to take care of his
23  actions and do the right thing.  So I just wanted
24  the right thing to happen, basically.
25      Q.   So if he did have an arrest warrant out
```

Page 18

```
 1  for him, would you have wanted the police officers
 2  to arrest him?
 3      A.   Yes.
 4      Q.   And did you want him out of your house
 5  when you found out that he had those arrest
 6  warrants?
 7      A.   Yes.
 8      Q.   And so you wanted to cooperate with the
 9  police to get him out of the house by having them
10  arrested?
11      A.   Correct.
12      Q.   And after you informed police officers
13  that Fabian Salinas was, in fact, in the home,
14  did -- at that point thereafter, no police officer
15  ever threatened you with committing a crime,
16  correct?
17      A.   No.  It was almost immediately when I
18  began speaking with them that they did that.  So I
19  felt coerced to say that he was in there because I
20  didn't know.  I didn't know for sure that he was
21  not.
22      Q.   So when Richardson first informed you
23  that he had arrest warrants and you could be in
24  trouble for harboring him, after that point,
25  that's when you gave him information that Fabian
```

Page 19

```
 1  was in the home, correct?
 2      A.   Correct.
 3      Q.   And after that point, no other police
 4  officer, including Richardson, ever brought up
 5  charges of harboring again, correct?
 6      A.   Correct.
 7      Q.   Were you scared at any point that
 8  Fabian Salinas might get injured?
 9      A.   I wasn't sure if he was still in my
10  home.  So, yes, I was scared if he was in my home,
11  because I seen the armored truck outside of my
12  house and all of the police.  So I was scared that
13  he was in there.
14      Q.   Were you scared any police officers
15  might get injured?
16      A.   No, I was not.
17      Q.   Were you scared that a violent
18  confrontation might occur?
19      A.   No.
20      Q.   After you gave police officers
21  permission to enter your home, do you remember
22  asking them if you could go walk around?
23      A.   No, I did not.  I asked them when I
24  would be able to go into my home.  I had
25  belongings that I needed for my kids.
```

Page 20

```
 1      Q.   Okay.  I'm going to play part of
 2  this audio again.  And this is audio labeled
 3  Caldwell 151, and I'll start it at the 16 minute
 4  and 56 second mark.  So I want you to listen to
 5  this, and then I'll ask you some questions.
 6  Okay?
 7      A.   Okay.
 8      (Audio played.)
 9      Q.   BY MR. BROWN:  Okay.  The beginning of
10  the audio, did you hear somebody say she wants to
11  know if she can go walk around?
12      A.   I did not hear that.
13      Q.   Okay.  Let's play it again, and let's
14  see if we can hear anything.
15      (Audio played.)
16      Q.   BY MR. BROWN:  What did you hear there?
17      A.   The officer asked or said that I wanted
18  to know if I could walk around.
19      Q.   Okay.  And I'm going to keep playing
20  the audio from that point forward.
21      (Audio played.)
22      Q.   BY MR. BROWN:  Okay.  Then did you hear
23  Officer Richardson say, "I prefer that you stay
24  right here for the moment.  Do you have someone
25  right here that, you know, you can sit with?"
```

Page 69

1    in my own home.  I was nervous about it.  It was
2    my first time being on my own.  So I felt more
3    comfortable with her there.
4        Q.   BY MR. BROWN:  And she had her kids
5    there, as well?
6        A.   Correct.
7        Q.   How many kids does she have?
8        A.   She has two.
9        Q.   How old are they?
10       A.   Now, they are 13 and 14, I believe.
11       Q.   What is your opinion of Crystal's
12   honesty?
13       MR. HUDSON:  Objection; overbroad.
14       THE WITNESS:  After this incident, I don't
15   know how honest she is.  I -- I don't know.  Our
16   relationship changed drastically after this
17   incident.  We don't really talk very much.
18       Q.   BY MR. BROWN:  So before the incident,
19   what was your relationship like with Crystal?
20       A.   We had a great relationship.  She was
21   there for me throughout my first child being born.
22   She was there for her brother being
23   incarcerated.  She was, essentially, in my son's
24   life and a part of his life.  She helped me a
25   lot.

Page 70

1        Q.   So what was it about this incident that
2    caused your relationship to change?
3        A.   I felt like she wasn't being honest and
4    truthful with me.  I felt like she knew -- I don't
5    know -- she knew what was going on, like she told
6    him where my house was.
7        Q.   So when you say you felt like she
8    wasn't being honest and truthful with you,
9    what was it she wasn't being honest with you
10   about?
11       A.   I don't know.  She would always do
12   things for her brother.  Her brother was -- she
13   was always going to do for her brother, rather
14   than me, you know.  She would ask to take my son,
15   and then I would find out later that she would
16   take him to go meet up with Fabian.  And I wasn't
17   aware of that situation at the time.  Basically,
18   she had her brother's back more than she had
19   mine.
20       Q.   Is there anything about this particular
21   incident of August 11, 2014, that you felt like
22   she wasn't being honest about?
23       A.   Can you repeat that?
24       Q.   Yeah.  Is there anything about the
25   incident of August 11th, 2014, that you felt like

Page 71

1    she wasn't being honest about?
2        A.   Yeah.
3        MR. HUDSON:  Objection; vague.
4        THE WITNESS:  I didn't understand why she
5    went to my grandma's house afterwards, and I
6    didn't understand why the police were called.  I
7    had no problem calling the police myself if I felt
8    I was in danger.
9        Q.   Anything else?
10       MR. HUDSON:  Same objection.
11       THE WITNESS:  What do you mean "anything
12   else"?
13       Q.   BY MR. BROWN:  Is there any other --
14   any other reason -- is there any other -- anything
15   else about the August 11th incident that you felt
16   like Crystal wasn't being honest about?
17       A.   No.
18       Q.   When Fabian was inside your home and
19   you directed him to go to the garage, after that
20   point did you have any other conversations with
21   him?
22       A.   When I did go give him some trash bags,
23   he was going through stuff.  There was some items
24   that were set out on a table that he had given to
25   Crystal to give to my son, and he started grabbing

Page 72

1    things.  I just told him take whatever he wanted
2    or take whatever was his.  I asked him to lock the
3    top lock when he left the house, and I let him
4    know I had to go register our son.
5        Q.   What do you mean by the "top lock"?
6        A.   I have a chain lock.  I asked him to go
7    through the back door when he left to -- to lock
8    my front door and the top lock and to leave the
9    back door unlocked.
10       Q.   So you asked him to lock the chain?
11       A.   Yes, I did.
12       Q.   Did you have any other conversations
13   with Fabian?
14       A.   No, I didn't.
15       Q.   Did he at any time argue with you?
16       A.   No.
17       Q.   Did he ever threaten you?
18       A.   No.
19       Q.   Did he ever threaten your children?
20       A.   No.  He would never threaten my
21   children.
22       Q.   Did he ever threaten Crystal?
23       A.   No.
24       Q.   Did he have a firearm on him?
25       A.   No.

18 (Pages 69 to 72)

Page 73

1      MR. HUDSON: Objection; speculation.
2      Q.   BY MR. BROWN: Did you see him with a
3   gun in his waistband?
4      A.   No, I did not.
5      Q.   At that time, were you aware that
6   Fabian was a suspect in a gun theft?
7      A.   No, I did not.
8      Q.   Did anybody ever tell you that Fabian
9   has stolen any guns?
10      A.   No, they did not.
11      Q.   When he came to your house, did he
12   bring anything with him?
13      A.   No, he did not.
14      Q.   Did he bring a bag?
15      A.   No.
16      Q.   Are you aware of whether or not he was
17   on drugs when he came to your home?
18      A.   When he came to my house, he didn't
19   seem like the same Fabian that I know. I can't
20   say that I know he was on drugs, but he appeared
21   to be on drugs to me.
22      Q.   And what was it about him that was
23   different than what you remember?
24      A.   Usually when we have conversations or
25   he comes to my house, he tries staying or being

Page 74

1   with me and trying to work things out or saying he
2   wants to work things out. This time, he just
3   wanted his things. He limited eye contact. He
4   wasn't really trying to conversate [sic] with me.
5   It was just unusual behavior.
6      Q.   And did that cause you any concern?
7      A.   No.
8      Q.   Why not?
9      A.   Because I was leaving at the time. I
10   just wanted him to get his things and leave, and I
11   thought I would just come home and relax after
12   that.
13      Q.   Did he make any comments to you that
14   would cause you to believe he was suicidal?
15      A.   No, he didn't.
16      Q.   Do you know what time Crystal left the
17   house?
18      A.   About the same time that Fabian
19   arrived.
20      Q.   Do you know why she left the house?
21      A.   I believe she said she needed to
22   register her kids, as well, into school.
23      Q.   Did Crystal ever tell you that she was
24   planning on calling the police?
25      A.   No, she did not.

Page 75

1      Q.   Did she tell you she was planning on
2   going to Debra Garcia's house?
3      A.   No, she did not.
4      Q.   And at any time did you consider
5   calling the police?
6      A.   The only time I considered calling the
7   police was in the morning.
8      Q.   So when Fabian arrived at your house,
9   you never considered calling the police?
10      A.   No, I didn't.
11      Q.   But at that time, you were aware he had
12   arrest warrants, right?
13      A.   Yes.
14      Q.   So why didn't you report him to the
15   police?
16      A.   You know, right when I left my house, I
17   had gotten a phone call from dispatch, from the
18   police. I had tried calling the number back. The
19   dispatch told me that they couldn't trace who
20   actually made the call out to me. So they said
21   they couldn't put me in touch with whoever made
22   the call to me. At that exact moment, my phone
23   died. I was more concerned about getting my son
24   registered into school because I waited until the
25   last minute to do it. So at that time, I didn't

Page 76

1   have -- you know, I didn't have a phone. My phone
2   was dead.
3      Q.   So when Fabian arrived at your home and
4   you let him into the garage, why didn't you call
5   the police while he was in the garage?
6      A.   Like I said, I was more concerned about
7   getting to my appointment that I needed to be at.
8   I wasn't thinking -- I would have told the police
9   that he was there, if I would have gotten them on
10   the phone or the officer that was trying to
11   contact me. But as soon as I talked to the lady,
12   my phone died.
13      Q.   Why were you -- but you would have been
14   willing to tell the police that he was there?
15      A.   Yeah. Yes.
16      Q.   And you would have been truthful with
17   the police?
18      A.   Correct.
19      Q.   What time was your appointment to
20   register your children for school?
21      A.   2:30.
22      Q.   Was it a specific time or was it like
23   you could show up any time between --
24      A.   It was between 2:30 and -- 2:00 and
25   2:30.

Tucker & Associates, 605 W. Fort St., Boise, ID 83702 (208) 345-3704

Page 77

1    Q. So you could have shown up any time
2 between 2:00 and 2:30?
3    A. Yes.
4    Q. Did you have a landline phone in your
5 house?
6    A. No, I did not.
7    Q. So your only phone was your cell
8 phone?
9    A. Correct.
10    Q. When Fabian was inside your home and
11 you were still at your house, did you make any
12 calls?
13    A. No, I did not.
14    Q. Did you send any text messages?
15    A. No, I did not.
16    Q. Did your phone have text messaging
17 capability at that time?
18    A. Yes.
19    Q. Did you receive any text messages?
20    A. No, I did not.
21    Q. Do you recall what time you left the
22 house to take your kids to the school?
23    A. It was approximately 2:00 o'clock.
24    Q. And when you left, was Fabian still in
25 the garage?

Page 78

1    A. Correct.
2    Q. And did you tell him you were leaving?
3    A. Yes, I did.
4    Q. Is that when you told him to lock the
5 chain?
6    A. Correct.
7    Q. And did you also tell him to leave the
8 back door unlocked?
9    A. Correct.
10    Q. Did he have a key to your house?
11    A. No, he did not.
12    Q. So when you left the house, what door
13 did you exit?
14    A. I went through the front door.
15    Q. Did you lock the door behind you?
16    A. Yes.
17    Q. But you couldn't lock the chain, of
18 course, right?
19    A. Correct, I couldn't.
20    Q. How far away was the school from your
21 home?
22    A. I actually just recently retraced my
23 steps, and it took me approximately 30 minutes
24 to get there walking. So I would say about
25 30 minutes walking distance.

Page 79

1    Q. Do you know how far away it is in
2 miles?
3    A. No.
4    Q. Do you know an approximate distance?
5    A. Maybe, one to two miles.
6    Q. And how long were you at the school
7 for?
8    A. I was at the school for, approximately,
9 15 minutes.
10    Q. And as you walked to school, you
11 received a call from dispatch?
12    A. Correct.
13    Q. What did they tell you?
14    A. My phone only rang twice. By the time
15 I went to pick it up, the call had already ended.
16 That's when I tried calling the number back, and
17 the dispatch advised me they couldn't retrace who
18 made the call.
19    Q. So when the dispatch initially called
20 you, you didn't talk to anybody?
21    A. No. I called back.
22    Q. When you did call back, you did talk to
23 somebody, and they didn't know who was calling
24 you?
25    A. Yes. And at that time, my phone died.

Page 80

1    Q. Did that cause you any concern when
2 dispatch called you?
3    A. Yes.
4    Q. What did you understand was the reason
5 they were calling you for?
6    A. I was unsure. That's why I was trying
7 to figure it out.
8    Q. Did you at any time think they were
9 calling you in relation to Fabian?
10    A. It did cross my mind. But like I said,
11 I was unsure. That's why I was trying to find
12 out.
13    Q. Would there have been another reason
14 that dispatch would have called you?
15    A. Maybe to follow up with the morning
16 call, the call I had made that morning. I was
17 unsure. Honestly, I thought they would be out
18 there patrolling. I thought they would have seen
19 Fabian even coming to my house. So I thought they
20 didn't need me to make any further calls because
21 they said they would be patrolling the area, and
22 so I thought maybe they seen him coming into my
23 home. I was unsure of what was going on.
24    Q. Okay. But you thought it was possible
25 that police might have seen him enter your home?

Page 81

1    A.  Correct.
2    Q.  And they might have already had
3  knowledge he was inside your home?
4    A.  Well, at that time, I wasn't thinking
5  that.
6    Q.  What were you thinking then about
7  that?
8    A.  Like I said, I thought maybe they were
9  following up with the call that I had made that
10  morning.  After going and registering my son and
11  walking back home, that's when I was thinking,
12  well, if they were patrolling the area like they
13  said they were going to be, then they should have
14  seen him.
15    Q.  Okay.  So when you left the school to
16  go back home, how long did it take you to arrive
17  back home?
18    A.  About 15 minutes to get home.
19    Q.  So took it you 30 minutes to get there,
20  but 15 to get back?
21    A.  No.  30 minutes during the walking
22  there and walking back.
23    Q.  Oh, okay.
24    A.  So 15 minutes going there -- I would
25  say maybe it was more like 10 minutes while I was

Page 82

1  filling out paperwork, and we were looking at his
2  teacher, my son's teacher, and then 15 minutes
3  back.
4    Q.  Okay.  So let me make sure I
5  understand.  So it was about 15 minutes for
6  you to walk from your house to the school, about
7  10 minutes at the school and about 15 minutes back
8  home?  Does that sound right?
9    A.  Correct.  Yes.
10    Q.  Okay.  And at what point did you see
11  police officers at your home?
12    A.  I noticed police were at my home once I
13  got almost directly in front of my neighbor's
14  house.
15    Q.  And did you -- did it make sense to you
16  that police officers were at the home, given the
17  fact that they were patrolling the area for Fabian
18  Salinas?
19    A.  It didn't make sense to me why they
20  were in my backyard.  No, it didn't.
21    Q.  Did it make sense to you why they were
22  at the location?
23    A.  Yes.  I had assumed that was the reason
24  why.
25    Q.  Okay.  And so you believed they were at

Page 83

1  the home -- their presence at your home had
2  something to do with Fabian?
3    A.  Correct.
4    Q.  And so where did you see police
5  officers located?
6    A.  They were in my backyard.
7    Q.  Okay.  How many of them?
8    A.  I believe there were three officers.
9    Q.  And all three were in the backyard?
10    A.  Correct.
11    Q.  You didn't see any officers in your
12  front yard?
13    A.  No.  When I first noticed them, one of
14  them was coming out of my backyard.  I first
15  noticed my gate was open to my backyard.
16    Q.  And do you know who the officer was you
17  saw coming out of the backyard?
18    A.  It is hard for me to remember.  To the
19  best of my knowledge, I would say -- I can't
20  remember his name.  I think he was a parole
21  officer.
22    Q.  Would Oscar Arguella sound familiar?
23    A.  That does sound familiar.
24    Q.  Do you think that was him?
25    A.  Yes.

Page 84

1    Q.  And then tell me what happened after
2  that.
3    A.  I believe that's when Officer
4  Richardson approached me.
5    Q.  And was Officer Richardson also in the
6  backyard?
7    A.  Yes.
8    Q.  And so after Oscar Arguella came out of
9  the backyard --
10    A.  Then they all came out.
11    Q.  -- they all came out?
12    A.  Correct.
13    Q.  Is there anything about the
14  conversation with Officer Richardson that you
15  remember that we haven't already talked about?
16    A.  Not that I can recall.
17    Q.  When Officer Richardson was talking to
18  you, were there other officers around in the same
19  conversation?
20    A.  I believe the parole officer was there,
21  as well.  But then the third officer, which I
22  believe was Officer Hoadley, went back to the
23  backyard.
24    Q.  Okay.  Do you remember the police
25  officers making any comments about calling the

1   SWAT team?
2       A.   No, I did not hear that.
3       Q.   So after your conversation with Officer
4   Richardson, what did you do?
5       A.   I believe after that is when they
6   advised me to -- if I could stand in a certain
7   area, which was across the street from my home.
8   And then that's when Officer Hoadley asked me if I
9   had anywhere to go.
10      Q.   And we already talked about that aspect
11  of it.  But who picked you up to take you to your
12  friend's house?
13      A.   It was actually Fabian's aunt, Ludi
14  Salinas.
15      Q.   Okay.  How did you contact her?
16      A.   I called her from Officer Hoadley's
17  phone.
18      Q.   So you called from Officer Hoadley's
19  phone, you called your friend, and also called
20  your aunt?
21      A.   I called my friend, and she said Yadi
22  was there at my friend's house.  So she said, "My
23  aunt is going to go pick you up."
24      Q.   Okay.  So what was happening at your
25  house when you left?

1       A.   The only thing that was happening at my
2   house was the -- I believe the three officers were
3   still the only ones that were there.  Officer
4   Hoadley did pull up his marked vehicle.  I did
5   notice that there was another unmarked vehicle
6   down the road, but that was all that I had seen.
7       Q.   Did you inform any police officer that
8   you were leaving?
9       A.   They asked me to leave.  So I didn't.
10      Q.   Who asked you to leave?
11      A.   Officer Hoadley.
12      Q.   A little bit earlier, we played some
13  audio where Officer Richardson said he wanted you
14  to stay.  After that point, is it your testimony
15  that Officer Hoadley asked you to leave?
16      A.   Officer Richardson asked me to stay in
17  that area.  He didn't want me walking towards my
18  home.  So he didn't actually ask me to stay at the
19  scene.  So, yeah, after that, that's when Officer
20  Hoadley asked me if I had anyone that could pick
21  me up.
22      Q.   Did he actually say the words, "I want
23  you to leave," or did he just say do you have
24  anywhere to go?
25      A.   He just said do I have anywhere to go.

1       Q.   Okay.  That's when you made the phone
2   call, correct?
3       A.   Correct.
4       Q.   After you got done with that phone
5   call, did you then inform Officer Hoadley, "I've
6   got someone to pick me up"?
7       A.   Correct.
8       Q.   Okay.  Did he make any response to you,
9   to that?
10      A.   No, he did not.
11      Q.   And did you remain at your friend's
12  house the remainder of the night?
13      A.   Yes, I did.
14      Q.   And on August 11th, did you speak with
15  any employees of the City of Caldwell who were not
16  police officers?
17      A.   No, I did not.
18      Q.   Were you aware that -- did you have any
19  family or friends who remained at the scene while
20  you went to your friend's house?
21      A.   My mother and, I believe, my
22  grandmother were at the scene, and I believe a
23  couple of Fabian's family members, as well.
24      Q.   Do you know which of Fabian's family
25  members were there?

1       A.   I believe his Aunt Ludi went back to my
2   house.  I believe Crystal was at the scene.  And I
3   believe Fabian's uncle, Reuben Salinas, was also
4   there.
5       Q.   And so while you were at your friend's
6   house, were you in contact with these five
7   individuals and getting updates from them?
8       A.   I was only in contact with my mother.
9       Q.   You never contacted any of the other
10  people?
11      A.   No, I did not.
12      Q.   Okay.  How often did you contact
13  Linda?
14      A.   If I can recall right, I believe I
15  called her almost every hour trying to figure out
16  what was going on.
17      Q.   Do you know when the first time -- do
18  you know what time it was the first time you
19  called Linda?
20      A.   I would say approximately 3:30 p.m.
21      Q.   And were you calling from your cell
22  phone?
23      A.   It was either my cell phone or Yadi's.
24      Q.   Have you checked your cell phone call
25  log to see if those calls are still on --

1    A.   I no longer have that phone.  It was
2  water damaged.  So. . .
3    Q.   Okay.  But you believe your first call
4  with her was, approximately, 3:30?
5    A.   Correct.
6    Q.   Do you remember what that conversation
7  was about?
8    A.   Basically, my mom was telling me that
9  there was SWAT and an armored vehicle there, and
10  they've been using the intercom system to try to
11  get Fabian to come out, and, basically, it was a
12  big scene.  She let me know that news was on their
13  way, and that was probably the first conversation
14  we had.
15    Q.   Do you remember anything else about
16  that conversation?
17    A.   Not that I can recall.
18    Q.   Do you know when you called her the
19  next time?
20    A.   Maybe at 4:00 p.m.
21    Q.   And tell me what you remember about
22  that call.
23    A.   It is hard for me to remember exactly
24  what was said between us.  All I remember is just
25  calling and trying to figure out what's going on,

1  what's happening.  Most of the conversations were
2  they are still out here trying to get Fabian to
3  come out.
4    Q.   And so is it fair to say you were
5  calling her every 30 minutes to an hour?
6    A.   Correct.
7    Q.   And did she ever tell you that police
8  officers were deploying gas into your home?
9    A.   Yes, she did.  She also advised me
10  there was a sniper with a rifle on top of the
11  armored vehicle.  She said it didn't look like
12  teargas was being shot in.  She said it looked
13  like an actual gun.  She said it looked like
14  rubber bullets or some other type of bullets.
15    Q.   So when she told you about the sniper
16  and something that looked like an actual gun being
17  fired into your home, was that in the same
18  conversation?
19    A.   Correct.
20    Q.   And do you remember what time that was
21  at?
22    A.   Well, this was going on for a period of
23  time.  So we had a couple conversations where she
24  had mentioned this.
25    Q.   But you don't recall a specific time?

1    A.   I can't recall.
2    Q.   And then at some point she called you
3  and told you that police officers had actually
4  entered the home, correct?
5    A.   Correct.
6    Q.   And I think -- correct me if I'm wrong,
7  but I think earlier you mentioned this occurred
8  around 9:00 o'clock.  Does that sound right?
9    A.   Correct.
10    Q.   Tell me about that conversation.
11    A.   Well, she told me they finally went
12  into my home.  I believe she told me they broke
13  windows in my backyard, broke out all of the back
14  windows to gain entry.  She let me know they
15  didn't use my keys.  She had also mentioned
16  something about they were going to use a -- some
17  type of UV ray lights or something to try to see
18  if he was in the walls of the house.  But other
19  than that, that was all she could tell me.
20    Q.   Did she ever tell you that police
21  officers attempted to use the key to unlock the
22  front door, but they couldn't get in because it
23  was locked with a chain?
24    A.   She had told me that they had seen
25  movement in the blinds, which could have been my

1  dog.  She also said that they said that someone
2  locked the dead bolt -- that they heard someone
3  lock the dead bolt.
4    Q.   Okay.  Did she ever tell you that the
5  police officers tried to enter the home using the
6  key in the front door, but that they couldn't
7  because it was chained?
8    A.   No, she did not.
9    Q.   Did anybody ever tell you that?
10    A.   No.
11    Q.   Did you talk to anybody else on
12  August 11th about the search of your home?
13    A.   Not that I can recall.
14    Q.   On the next day, on August 12th, did
15  you talk to anybody about the search?
16    A.   I believe that's when I was in contact
17  with Officer Wright.
18    Q.   And what did Officer Wright tell you?
19    A.   I believe he's the one that set me up
20  with the two-week voucher at a hotel in Nampa.  I
21  had asked him when I could get my keys.  He set up
22  a time that I could go into the police station and
23  get my keys.  And I also met with him briefly when
24  I grabbed my keys from him.
25    Q.   Anything else you can remember about

Page 161

1  because I don't know what to do with them.
2      Q.  Okay.  You were asked earlier about
3  your conversations with Corporal Sperry, I believe
4  it was.  And you testified that you informed
5  Corporal Sperry that you didn't want them to
6  damage your house.
7      A.  Correct.
8      Q.  Do you remember if that was before the
9  police department damaged your house or after
10  or --
11      A.  This was before they started to put in
12  the teargas.  Once my mom advised me that SWAT had
13  arrived and an armored vehicle was on scene, I
14  knew the situation had gotten bigger than what I
15  expected.  And so I wanted to make the statement
16  that I didn't want my stuff to be damaged.
17      Q.  Okay.  How do you know that that
18  happened before they had started firing teargas?
19      A.  Because my mom was on scene, and she
20  let me know.
21      Q.  Okay.  You also testified that the
22  morning of August 11th of 2014, Fabian had come
23  over to your house that morning -- and correct me
24  if I'm misstating anything -- and that he was
25  there to pick some things up.

Page 162

1      A.  Um-hum.
2      Q.  You stated that something was, I'm
3  paraphrasing, off about him, that he seemed like
4  he might have been on drugs?
5      A.  Correct.
6      Q.  Did you tell anyone that you thought he
7  was on drugs that day?
8      A.  No, I did not.
9      MR. HUDSON:  No further questions.
10
11      FURTHER EXAMINATION
12  BY MR. BROWN:
13      Q.  I have some questions.
14      Earlier, Shaniz, you testified that
15  when you had that conversation with Corporal
16  Sperry about the damage -- your concern about
17  damage to your property, it was after the police
18  had already entered the home.  What has caused you
19  to change that testimony now?
20      MR. HUDSON:  Objection; misstates testimony.
21      THE WITNESS:  I had -- I think I said that I
22  remembered telling her that, but it didn't seem to
23  be at the right time that was stated in the
24  document.
25      MR. BROWN:  I think I left that exhibit in

Page 163

1  my office.  Let me go grab that real quick.
2      (Off the record.)
3      Q.  BY MR. BROWN:  Okay.  Shaniz, you
4  stated that you remember telling Sperry that, but
5  it didn't seem to be at the right time that was
6  stated in the document.  What do you mean by
7  that?
8      MR. HUDSON:  Objection; vague.
9      THE WITNESS:  Well, I had remembered --
10  after my mom had told me that SWAT and an armored
11  vehicle had arrived, I remember after my next
12  conversation with Sperry, I was upset at that
13  time.  So I made sure to tell her at that time
14  that I would be upset if my house was damaged.
15      Q.  BY MR. BROWN:  And if you look at
16  Exhibit 20, I believe, Sperry's report, which
17  conversation was that that you are now claiming to
18  have informed Sperry of the damage?
19      MR. HUDSON:  Objection; misstates testimony.
20      MR. BROWN:  What is it misstating?
21      MR. HUDSON:  She hasn't claimed to have
22  informed Sperry in any specific conversation.
23      Q.  BY MR. BROWN:  So you never informed
24  Sperry of your concern for damage?
25      MR. HUDSON:  I'm saying she hasn't claimed

Page 164

1  that.
2      Q.  BY MR. BROWN:  Let me ask you that.
3      Did you ever inform Sperry that you
4  were concerned about damage to your property?
5      A.  Yes, I did.
6      Q.  When did you inform her of that?
7      A.  It was during one of the phone calls.
8  I don't recall exactly which phone call, but I
9  remember, specifically, telling her that before
10  they deployed teargas into my home.
11      Q.  Okay.  I asked you that question this
12  morning.  And my question to you was, "And at one
13  point you expressed concern about your house being
14  damaged?"  And your answer was, "Correct."  And
15  then I then asked you, "And at that point, the
16  police had already entered your home when you
17  expressed that concern, correct?"  Your answer
18  was, "Correct."  My question was then, "And why is
19  it at that point you expressed concern about your
20  house being damaged?"  And your answer was, "By
21  this time, this whole standoff has been going on
22  for hours, almost all day.  And from what I was
23  told by my mother, I believe the cops had been in
24  the home and had been in the home for a couple of
25  hours, so I was concerned why they were still in

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

---

SHANIZ WEST, an individual,     )
                         )
           Plaintiff,  )  No. 1:16-cv-359
                         )
vs.                   )
                         )
CITY OF CALDWELL; CITY OF     )
CALDWELL POLICE DEPARTMENT;   )
FORMER CHIEF CHRIS ALLGOOD, in his )
official and individual capacity;   )
SERGEANT DOUG WINFIELD, in his   )
official and individual capacity;   )
LIEUTENANT DEVIN RILEY, in his   )
official and individual capacity;   )
and DOES I-X,               )
                         )
           Defendants.  )

---

## DEPOSITION OF JOEY HOADLEY

Naylor & Hales, P.C.
950 West Bannock Street, Suite 610
Boise, Idaho

Friday, December 16, 2016
Beginning at 9:02 a.m.

**QnA COURT REPORTING, LLC**
Lori A. Pulsifer, RDR, CRR, Idaho CSR

354

P.O. Box 1058, Eagle, Idaho 83616-1058
realtimeQnA@msn.com . QnAcourtreporting.

com

(ELECTRONIC COPY)   208.484.6309 . 208.286.7426 (fax)

## Page 8

1  Q. What do you recall about that incident?

2  A. We had a call there earlier in the shift from

3  Shaniz about her ex-boyfriend who she believed was

4  knocking on her windows and circling her house in the

5  night. He was a wanted person.

6  We received a call later in the shift from her

7  grandmother saying that she had received a call from

8  Shaniz saying Fabian was at the home and was threatening

9  her with a BB gun.

10  Q. Did you personally ever speak with Shaniz?

11  A. Yes, at one point.

12  Q. At the time of this incident, what was your

13  role with the Caldwell Police Department?

14  A. I was assigned to the patrol division as a

15  sergeant.

16  Q. Were you specially tasked with any gang-related

17  assignments?

18  A. Not at that time. I do have vast gang

19  experience.

20  Q. Prior to that time or subsequent to that

21  time?

22  A. Prior to.

23  Q. At that time, you were not in any specific

24  gang-related task force or anything like that?

25  A. No. I was assigned as a patrol sergeant.

## Page 9

1  Q. You mentioned that you spoke directly with

2  Shaniz at one point in time. What do you recall about

3  your communications with Shaniz?

4  A. As we were at the home and had the house

5  surrounded with officers, Shaniz came walking up. She

6  was pushing a baby stroller. She came walking up to the

7  house from down the street and asked what was going on.

8  Q. Were you the officer that communicated with

9  Shaniz when she asked what was going on?

10  A. Yes.

11  Q. Tell me what you can recall about that

12  conversation with Shaniz.

13  A. In speaking with her, I explained to her about

14  the call we had received about Fabian being in the home.

15  I explained to her again that he was wanted, had a

16  felony warrant. Ultimately, she provided me the keys to

17  the residence and permission to go in and apprehend him.

18  Q. I want to back up a little bit. You said that

19  you had the house surrounded by officers when she came

20  walking up; is that correct?

21  A. Yes.

22  Q. Do you recall how many officers were present at

23  the time that Shaniz approached her home?

24  A. I don't recall the specific number or the names

25  of the officers, but I would say there were three to

## Page 10

1  four.

2  Q. You talk about the house being surrounded. Can

3  you describe for me where officers were located in

4  relation to her home?

5  A. I believe we had an officer in the front,

6  watching the front door and garage. I was on the east

7  side of the house. There was an officer on the back

8  corner of the house, watching the backyard and the back

9  door.

10  Q. Was the yard fenced?

11  A. I believe so.

12  Q. So when the officer was in the backyard, was he

13  on the inside of the house?

14  A. He had gone through an open gate.

15  Q. Do you recall how many patrol cars were

16  present?

17  A. No.

18  MS. RAINEY: I want to start looking at some of

19  the reports that have been provided.

20  (Exhibit 18 was marked.)

21  Q. BY MS. RAINEY: The court reporter is handing

22  you what she has just marked as Exhibit 18. It should

23  be a four-page document with Bates numbers on the back

24  that read CALDWELL 8 through CALDWELL 11. Is that what

25  you have been handed?

## Page 11

1  A. Yes, ma'am.

2  Q. Would you take a minute and review Exhibit 18

3  and let me know if you are familiar with that type of

4  document?

5  A. Yes.

6  Q. And what do you recognize Exhibit 18 to be?

7  A. This would be the Call Detail Report that is

8  created through our mobile system -- or our in-house

9  data system; it's called Spillman.

10  Q. What type of information is this Call Detail

11  Report capturing?

12  A. This captures the nature of the call, the date

13  and time, the location, the call comments that dispatch

14  receives from the reporting party, and then the radio

15  log of officers.

16  Q. When you talk about the radio log of officers,

17  what are you referring to?

18  A. It begins about half-way down on the first

19  page. It is titled "Radio Log." Some of these are

20  dispatch comments here, but some of these are officers

21  that were initially dispatched and as officers arrived

22  on scene throughout the entire call.

23  Q. Can you show me an example of a dispatch

24  comment?

25  A. Where it says "E Lloyd" there -- that is a

### Page 20

Q. I see there that we have an "en route" for him and a "complete" for him. Do you see that?

A. Yes, ma'am.

Q. Would this be what it would look like if an officer arrived on scene and then did not hit the button or call into dispatch and let them know? It kept showing "en route" until he marked it "complete"?

A. Probably, yes.

Q. You do actually recall him being on scene?

A. Yes.

Q. Was he on scene at the time that Ms. West arrived at the home with her children?

A. I believe so.

Q. So I think, then, that we have got four officers on scene -- yourself, Officer Arguello, Larry Hemmert, and Officer Schreiber -- is that correct?

A. Correct. If I may?

Q. Go ahead.

A. I believe P.O. Arguello was assigned to our street crimes unit at the time. We have, like, an interagency task force, basically, with our street crimes and our probation and parole.

I believe he arrived with Detective Richardson. I think they rode together, if I remember right. They commonly ride together. He is 101.

### Page 21

Q. Detective Richardson is 101?

A. Yes.

Q. Was Detective Richardson on scene when you arrived -- I mean, when Ms. West arrived with her children?

A. I believe Richardson and Arguello were both there when she arrived.

Q. If we look at CALDWELL 8, the first page, we see an entry down at the bottom of that page with "M Richards" and then it cuts off. Is that "Richardson"?

A. Yes, ma'am.

Q. It shows Detective Richardson arriving on scene at 14:31:06; is that correct?

A. Correct.

Q. So by the count now, it is Detective Richardson, yourself, the probation officer, and two other patrol officers; is that correct?

A. Correct.

Q. You thought Detective Richardson and Officer Arguello probably arrived in the same vehicle?

A. Most likely. That was a pretty common occurrence.

Q. Did each of the other officers arrive in their own vehicles, or were the other officers traveling together?

### Page 22

A. The other patrol officers ride alone in a patrol car.

Q. What about you? Were you alone?

A. Yes.

Q. So it looks like there would have been five uniformed personnel and probably four police cars there; is that correct?

A. Most likely.

Q. Would those have been marked police cars or unmarked police cars?

A. Detective Richardson's car is unmarked.

Q. The other three would have been marked?

A. Yes.

Q. What kind of vehicle does Detective Richardson drive?

A. I believe, at the time, he was driving an unmarked Chevy Impala.

Q. All right. You said that the officers had the house surrounded, and you indicated that there was one officer guarding the front door and the garage door; correct?

A. Correct.

Q. Do you recall who that was?

A. I don't.

Q. You said there was another officer in the

### Page 23

backyard that had gained entry through an open gate; correct?

A. Correct.

Q. Do you recall who was in the backyard?

A. I believe it was Officer Hemmert.

Q. And where were you located?

A. I was on the east side of the house, trying to keep an eye on the front and back.

Q. Where were you in relation to the sidewalk? The house versus the sidewalk, can you kind of --

A. Like, the road out front?

Q. Yes. Sure.

A. I don't know. Maybe it would be twenty-five feet north of the sidewalk.

Q. Where was Detective Richardson?

A. I don't recall. I believe he and P.O. Arguella arrived a little later than the patrol officers.

Q. Did Detective Richardson remain in his vehicle, or did he get out of the vehicle?

A. I'm not sure about Detective Richardson.

Q. What about P.O. Arguella?

A. I remember P.O. Arguella being with us at the scene.

Q. What do you recall P.O. Arguella doing when he was out? Where was he located, or what was his role?

Page 24

1     A.  He moved around a little bit.  He was just kind
2 of helping watch the house.  I remember him being out
3 near the front at one point and kind of relieving me on
4 the side at one point.
5     Q.  Did the police cars have their lights on?
6     A.  When we arrived?
7     Q.  Right.
8     A.  No.
9     Q.  When Ms. West arrived with her children, were
10 their lights on?
11    A.  No.
12    Q.  Where were the cars parked?
13    A.  I know my car was parked a couple of houses
14 west of the location, on the street.
15    Q.  All right.  Do you recall where the other cars
16 were parked?
17    A.  I know one of the vehicles was parked on the
18 road to the north, but I can't recall who that was.
19 Those are the only two in particular I remember.
20    Q.  You say, "...on the road to the north..."  Was
21 that car in front of Ms. West's house or a home or two
22 down?
23    A.  One block north.
24    Q.  A block north?
25    A.  Yes.

Page 25

1    Q.  How far, again, was your car from Ms. West's
2 house?
3    A.  It was two to three houses to the west, parked
4 on the street.
5    Q.  When the officers had surrounded the home, did
6 they have their weapons drawn?
7    A.  I don't recall.
8    Q.  Would it be standard protocol to have a weapon
9 drawn when establishing a perimeter like that?
10    A.  It depends on the circumstances.
11    Q.  In this particular circumstance, you don't
12 recall?
13    A.  I don't recall.  It wouldn't be out of the
14 question.
15    Q.  Do you recall if you had your weapon drawn?
16    A.  I don't believe so.
17    Q.  What makes you say you don't believe so?
18    A.  I just don't remember -- from the position I
19 was standing on the west side of the house, there wasn't
20 a door or anything for someone to emerge from
21 immediately.
22    Q.  Okay.
23    A.  I was trying to maintain a visual on the
24 officers on the back and the front, in case something
25 happened, so that I could assist one of them.

Page 26

1    Q.  From your vantage point, could you see both the
2 officer in the front and the officer in the back?
3    A.  Yes.
4         (Exhibit 4 was referenced.)
5    Q.  BY MS. RAINEY:  The court reporter has just
6 handed you what was marked as Exhibit 4 in some of the
7 prior depositions.  It should be a document with Bates
8 No. CALDWELL 5.  Do you see that at the bottom?
9    A.  Yes, ma'am.
10    Q.  Would you take a minute and review that
11 document and let me know if it is familiar to you?
12    A.  Okay.
13    Q.  Is that document familiar to you?
14    A.  Parts of it.
15    Q.  What do you recognize Exhibit 4 to be?
16    A.  Basically, this entire second paragraph is the
17 same call comments from dispatch.
18    Q.  The same call comments that we saw on Exhibit
19 18 that we were just looking at, if you look at the
20 bottom of CALDWELL 9?
21    A.  Yes, ma'am.
22    Q.  On Exhibit 4, the name J Hoover appears.  Can
23 you tell me who J Hoover is?
24    A.  That was either a dispatcher or a call-taker.
25    Q.  Can you tell by looking at Exhibit 4 who it was

Page 27

1 that provided the narrative that appears below those
2 call comments?
3    A.  Detective Richardson.
4    Q.  And from where do you get that information?
5    A.  Both on the top where it says "Officer" and
6 then at the bottom, as well.
7    Q.  All right.  I want to go through the
8 information that Detective Richardson put in this report
9 and find out what you know about it.  The first sentence
10 there: "I attempted to contact the resident Shaniz
11 West, by phone, several time" -- there's a typo there --
12 "but did not get an answer."
13    Do you see that?
14    A.  Yes.
15    Q.  Do you recall at any time having a conversation
16 with Detective Richardson about his attempts to contact
17 Ms. West by phone?
18    A.  I remember having a conversation with Detective
19 Richardson.  At this time, I don't remember exactly what
20 we talked about.
21    Q.  What do you recall about your conversation with
22 Detective Richardson?
23    A.  I just remember it being kind of a quick
24 briefing on the scenario.  I do recall him advising me
25 that he had intelligence -- that he had received recent

## Page 40

1     A. She indicated to me it was a short time, just
2 enough time to walk down and register her child. The
3 school is within walking distance. It is just a couple
4 of blocks away.
5     Q. "A couple of blocks" meaning two blocks or "a
6 couple of blocks" meaning seven or eight blocks?
7     A. I don't know. It's in the neighborhood.
8     Q. You are not quite sure exactly how far?
9     A. Not exactly, no.
10     Q. When you use the phrase "a short time," are you
11 referring to five minutes? Thirty minutes? An hour?
12 What was your impression when she said she had been gone
13 just a short time?
14     A. You know, just knowing how close the school was
15 and registering a single child for school, I would
16 assume it was within the hour.
17     Q. How long had you and other officers been at the
18 scene when Shaniz arrived?
19     A. I don't know exactly. I would say, probably
20 fifteen minutes maybe.
21     Q. Let's go back to Exhibit 18. I want to see if
22 we can use Exhibit 18 to kind of help us develop that
23 timeline a little bit. If we look at the entry for J
24 Cordell, that shows an arrival on scene at 14:16:02. Do
25 you see that?

## Page 41

1     A. Yes.
2     Q. It shows that it is canceled one second later;
3 correct?
4     A. Correct.
5     Q. We are not sure, from this, whether or not
6 there was an officer that arrived at 14:16:02, but there
7 may have been; correct?
8     A. Possibly. I don't recall him being out there.
9 So that may have been an error.
10     Q. The next entry that we see for someone arriving
11 on scene is L Hemmert at 14:26:53; is that correct?
12     A. Correct.
13     Q. From looking at either Exhibit 18, Exhibit 4,
14 or Exhibit 6, can you tell at what time it was that
15 Shaniz appeared at the residence?
16     A. I don't believe any of them say what time she
17 arrived.
18     Q. At the time she arrived, had Detective
19 Richardson already arrived?
20     A. I believe so, yes.
21     Q. Do you know whether Johanna Vincent was on
22 scene at the time Shaniz arrived?
23     A. No.
24     Q. She was not?
25     A. No.

## Page 42

1     Q. What else do you recall about your conversation
2 with Ms. West when she arrived at her home?
3     A. After explaining the circumstances of why we
4 were there again today, she provided me the keys to the
5 residence and allowed us to enter, to go apprehend
6 Fabian.
7     Q. Did you threaten Ms. West at any time regarding
8 what might happen to her if she did not allow you to go
9 in her home?
10     A. I did not threaten her, no.
11     Q. Did you advise her at any time as to what would
12 happen to her if she did not allow you to go into the
13 home?
14     A. No. I did advise her of repercussions of
15 harboring somebody. At this time, basically, we had
16 received two calls -- one of them was from her,
17 herself -- about Fabian being at the house.
18     I always advise people, if there is someone
19 with a warrant, the circumstances -- or the consequences
20 of harboring someone, just to get that out of the way.
21     Q. So when you refer to the two calls that you
22 received about Fabian being at the house, the one from
23 Shaniz that you are referring to is the one that had
24 occurred at approximately 7:00 o'clock that morning; is
25 that correct?

## Page 43

1     A. Correct.
2     Q. We are nearing 3:00 o'clock in the afternoon at
3 this time; correct?
4     A. Correct.
5     Q. What do you recall advising her regarding the
6 consequences of harboring?
7     A. I explained to her again -- and I wanted to
8 make sure it was on audio recording -- that Fabian did
9 have a felony warrant and the information we had was
10 that he was in her home.
11     I have had cases previously where if you don't
12 advise those things on audio, where it's recorded, that
13 the person has a felony warrant and the consequences of
14 harboring somebody, then a case won't proceed if the --
15 if things go bad.
16     So I advised her of those things. You know, I
17 explained to her, you know, "I don't want you to get in
18 trouble for him being in your house."
19     You know, she had called us earlier in the day.
20 She was cooperative with us. She seemed like she wanted
21 him out of her home.
22     Q. Okay.
23     A. She provided me the keys. I remember that they
24 were on a lanyard of some sort. She provided me the
25 keys and told us to go get him.

## Page 48

1  their assistance?

2    A.  Just a culmination of circumstances -- a wanted

3  felon, possibly armed with a firearm, barricaded in a

4  house, not responding, not coming out, a pit bull inside

5  of the home, which is always a concern for us, as

6  well --

7    Q.  Right.

8    A.  -- and reports of him being under the influence

9  of drugs.

10    Q.  Did you advise Shaniz that you were going to

11  have SWAT come down and assist you in getting

12  Mr. Salinas out of the home?

13    A.  I don't recall.

14    Q.  Did you have any discussion with Shaniz about

15  what SWAT was and what SWAT involvement would entail?

16    A.  I don't remember that, no.

17    Q.  Did you ever advise Shaniz that the Caldwell

18  Police Department did not intend to use the key that she

19  had given them for purposes of accessing the home?

20    MR. LANDON BROWN:  Object to the form of the

21  question.

22    THE WITNESS:  No.

23    Q.  BY MS. RAINEY:  The next sentence reads:

24  "Patrol officers maintained perimeter on the residence

25  while awaiting SWAT arrival."  Is that just maintaining

## Page 49

1  kind of the positions that you have previously described

2  to me?

3    A.  Yes.

4    Q.  What was Shaniz doing at that time?

5    A.  I believe Shaniz was standing back behind a

6  patrol car.  I believe she was in the area but not, you

7  know, in the direct vicinity of the home.  We didn't

8  want her to get hurt if shots began firing.  So she was

9  near a patrol car, down the street.

10    Q.  Was an officer with her?

11    A.  I believe so, but I don't remember who it would

12  have been.

13    Q.  It wasn't you?

14    A.  No, I don't think so.

15    Q.  "I announced numerous times over the PA system

16  in my marked patrol car that Fabian Salinas was under

17  arrest and to surrender peacefully."  Do you see that?

18    A.  Yes.

19    Q.  You testified earlier that your car was parked

20  about two to three houses down.  Did you move the car at

21  some point to make those announcements, or were you

22  making those from down the street some distance?

23    A.  At that point, I moved my patrol car in front

24  of the house.

25    Q.  Okay.

## Page 50

1    A.  I activated the lights and used my PA system to

2  make it very well known that we were police.

3    Q.  The next sentence here:  "P.O. Oscar Arguello,

4  who was on scene, advised while standing near the front

5  door he heard someone come to the front door...and

6  engage the deadbolt."  Do you see that?

7    A.  Yes.

8    Q.  That is what we were discussing earlier when

9  you were mentioning that very incident; correct?

10    A.  Yes.

11    Q.  Is there anything that you recall about the

12  incident that is not reflected in this narrative report

13  that we have just gone over?

14    A.  Not that I can think of.

15    (Exhibit 3 was referenced.)

16    Q.  BY MS. RAINEY:  I want to show you what was

17  previously marked as Exhibit 3.  Exhibit 3 is a two-page

18  document Bates-numbered CALDWELL 566 and '567.  Is that

19  what you have been handed?

20    A.  Yes, ma'am.

21    Q.  Take a moment and look at Exhibit 3 and let me

22  know if you recognize that document.

23    A.  Yes.  This is our consent search policy at the

24  Caldwell Police Department.

25    Q.  Prior to today, have you had an opportunity to

## Page 51

1  read the Caldwell Police Department's consent search

2  policy?

3    A.  Yes, I have.

4    Q.  When was the most recent time prior to today

5  that you have reviewed the policy that is reflected in

6  Exhibit 3?

7    A.  This week, actually.

8    Q.  Were you reviewing the policy this week for

9  purposes of this lawsuit or for some other purpose?

10    A.  Actually, I review policies and update and

11  write policies as part of my job description.  This is

12  kind of one of the ones that I have been reviewing.

13    Q.  Prior to reviewing it this week for updating

14  purposes, have you previously had occasion to update the

15  consent search policy?

16    A.  Not this one in particular, no.

17    Q.  Are you providing any updates to the policy?

18    A.  I don't know yet.  I am just getting started.

19  I'm working on several of them right now.

20    Q.  Fair enough.  I want to go through a little bit

21  of this policy.  In paragraph D, at the very bottom of

22  the page, it defines what a consent search is.

23    It indicates:  "A search warrant is not

24  necessary where a person who has authority or control

25  over the thing or place searched consents to the

Page 52

1    search." Do you see that?
2       A. Yes.
3       Q. Did you at any time attempt to get a search
4    warrant for purposes of entering Ms. West's home?
5       A. No.
6       Q. Why not?
7       A. Well, she had provided us consent. She
8    provided me the keys to the residence. I had also
9    contacted our on-call prosecutor.
10      Q. Who was that?
11      A. I don't recall specifically who it was at the
12   time. After running down the facts of the case and that
13   we were entering the home to, basically, arrest a person
14   with a felony warrant and not necessarily to search the
15   home for drugs or illegal things, they said a search
16   warrant wasn't needed if we had consent.
17      Q. You don't recall who that prosecutor was?
18      A. I don't.
19      Q. Do you recall --
20      A. It's a rotating list.
21      Q. Do you recall if it was a male or a female?
22      A. I don't recall.
23      Q. Part of the explanation that you recall
24   receiving from the on-call prosecutor was that, because
25   you were entering the home to execute a warrant, as

Page 53

1    opposed to search for drugs or something else, it
2    changed the analysis somehow?
3       A. Yes.
4       Q. That and the fact that you had consent to enter
5    the home?
6       A. Yes. I think the consent was the big factor.
7       Q. What prompted you to call the prosecutor?
8       A. Normally, any time we are going to activate
9    SWAT, we will run the situation by a prosecutor just
10   to kind of --
11      Q. Is that policy?
12      A. It's not policy. It's just kind of a standard
13   operating procedure.
14      Q. Did you contact the prosecutor on your own
15   initiative, or did Lieutenant Seevers or someone else
16   ask that you contact a prosecutor?
17      A. I believe I did it on my own, if I remember
18   right. I normally do.
19      Q. The last sentence of that consent search
20   paragraph states: "The sole justification for a consent
21   search is the existence of voluntary consent." Do you
22   see that?
23      A. Yes.
24      Q. Explain to me what is meant by that sentence.
25      A. That it's based on the person who is

Page 54

1    responsible for the property giving their consent
2    voluntarily.
3       Q. Once consent is obtained from a person, what
4    limitations do you understand to exist on what the
5    police can do to effect that search?
6       A. Limitations are basically guided by the person
7    giving consent. So if they consent to a search, then
8    there are no limitations, basically, I mean, unless you
9    are talking about body cavity and stuff like that. As
10   far as a home or a vehicle, if they give consent, it's
11   full consent unless they restrict it.
12      Q. So if a person gives consent to search their
13   home, it is your understanding that it is full consent
14   to do anything the officers deem necessary unless the
15   person giving consent restricts it somehow?
16      MR. LANDON BROWN: Objection. Form of the
17   question.
18      MS. RAINEY: What is your objection? To the
19   form?
20      MR. LANDON BROWN: The form of the question.
21      MS. RAINEY: I know. But what about the form
22   was objectionable?
23      MR. LANDON BROWN: Can you repeat the question
24   for me?
25      (The pending question was read.)

Page 55

1       MR. LANDON BROWN: I don't think he said it --
2    anything necessary was his testimony. I think he said
3    full consent unless authorized -- or unless restricted
4    by the person giving consent.
5       MS. RAINEY: I am going to have her read it one
6    more time. Let me know what, if anything, I've missed.
7    This is one of those things where I just absolutely have
8    to make sure that we are communicating clearly.
9       I will have the court reporter read it one more
10   time. If there is anything stated in there that is not
11   precisely clear, please let me know what is not clear.
12      (The pending question was read.)
13      THE WITNESS: I guess my only question on the
14   form of the question is: Are we talking about
15   searching -- like, a limitation of the scope of the
16   search?
17      I mean, if someone says, "You can search my
18   house," I understand that to be bedroom, bathroom,
19   garage -- every room in the house.
20      Q. BY MS. RAINEY: So it is your understanding if
21   someone says, "You can search my home" -- let's approach
22   it this way.
23      When you use the phrase "scope of the search,"
24   what are you referring to with respect to "scope of the
25   search"?

Page 56

A. The areas allowed to be searched.

Q. So when someone gives consent to search the home, it is your understanding that you can search any area within the home that you deem necessary to effect the search; is that correct?

A. The home or on the property.

Q. What about consent to the means used to effect the search? Is it your understanding that there is any limitation to the methodology that the officers will use to effect the search?

A. To me, I guess, the entry and the consent are two completely different conversations.

Q. Explain to me why you believe there is a distinction between the entry and the methodology.

A. When someone provides consent -- in this scenario, where she provided consent to enter and she provided us the keys to the home, she was giving us an entryway to enter the home and to search the home.

Q. So that is consent to enter the home. What about consent to the methods used to enter the home?

A. I guess that would have to be specified.

Q. By what?

A. I don't know -- the conversation we had was — you know, she produced us keys and told us the back door was open, although it wasn't.

Page 57

Q. Okay.

A. So I had actually considered making entry ourselves with a patrol team; but, then, with just all of the circumstances surrounding it, we said, "No, this is too dangerous." So I took the keys and left them in the door for the entry decision to be made by the SWAT commander.

Q. Do you want to take a break? We have been going about an hour and twenty minutes.

A. I'm okay if you guys are.

Q. I'm all right.

After you received the keys from Ms. West -- explain to me what you did with the keys after you received them from her.

A. I put them in the front door.

Q. Okay.

A. Because we initially thought -- we considered making entry with the patrol team we had; but, then, just weighing the circumstances, we were, like, "No, this is too dangerous."

The door was locked. So, you know, I just left the keys in the door, hanging from the outside of the door with the lanyard.

Q. Okay.

A. We maintained a perimeter while we notified

Page 58

SWAT. I left the keys there as an easy entry access --

Q. Okay.

A. -- if they decided to use that as the entryway.

Q. Did you at any time consider entering the home before Ms. West arrived on scene?

A. No.

Q. When Ms. West arrived on scene, how were the various officers communicating with each other?

A. When she arrived on scene?

Q. Yes. Were you on radios that allowed you to speak with each other, or how was that working at that time?

A. At that point, we were basically communicating just through talking to each other. I mean, we were close enough where we could -- if we needed to talk, one of us could go over and brief something with the other.

Q. But you were spread out along the perimeter of her home; correct?

A. Yes.

Q. So your actions with the keys, after Ms. West provided the keys to you, was to go put them in the door. Then you thought, "Hey, this isn't smart; I need to call in SWAT"? Correct?

A. Correct.

Q. At that time, did you go advise Ms. West that

Page 59

you were going to use a methodology to enter her home other than the keys?

A. No.

Q. Have you, in your time as an officer with the Caldwell Police Department, ever received training, any educational training, about obtaining consent for the methodology that you are going to use when searching someone's home?

A. I don't know if it gets that specific. I mean, we talk about consent searches and search warrants at, you know, law week at the Academy and mandatory training blocks with our prosecutor. I don't know if it has ever gotten as specific as getting into the methodology of the entry.

Q. So kind of what I am attempting to get from you is this: Once the officers have consent to enter the home, is it the understanding within the Caldwell Police Department that, once you have consent to enter, the police department has discretion to use whatever methodology it deems necessary to enter the home?

MR. LANDON BROWN: Object to the form of the question.

THE WITNESS: I would say the SWAT team has discretion on the methodology that they would use to enter the home.

## Page 60

Q.  BY MS. RAINEY:  Why would you say that the SWAT team has the discretion?

A.  Because they have different tools and tactics than a normal patrol officer responding to a call would use.  They have specialized training, weapons, and breaching tools.

Q.  As a patrol officer, do you have any discretion as to how you effect the entry into the home?

A.  Yes.

Q.  And what discretion do you have, as a patrol officer?

A.  If we need to go through a window, an unlocked door, if we have to force entry by kicking a door in, exigent circumstances, things like that.

Q.  Okay.

A.  We have some sort of discretion.

Q.  And I am talking about when you have consent from a third party.

A.  I don't know how to answer that because, normally, when we are given consent, it's a voluntary, consensual, cooperative scenario where we don't need to do that.

Q.  You don't need to do what?

A.  Where we wouldn't have to force something open unless the providing party says to do so.  Normally, we

## Page 61

haven't -- I personally can't even think of an example where I have had to do that.

Q.  Where consent was provided and you had to somehow force entry, even though consent was provided?

A.  Correct.

Q.  Okay.

A.  Oh, I'm sorry.

Q.  Go ahead.

A.  I have had scenarios where consent was provided and we had to kick a door in.

Q.  Tell me about that situation.

A.  We had -- just recently, we had a landlord-tenant dispute; and the landlord -- the owner of the home -- the renter was having some mental problems.  He said, "Go in and get him.  You know, I'm giving you guys permission."  Those type of things are --

Q.  Did the landlord not have a key?

A.  With his permission -- he had a key, but the locks had been changed.  So he was, like, "You guys can go in there."  So there have been scenarios, I guess.

Q.  In that particular situation, the landlord said, "Go in there, however you need," because you tried the lock and it didn't work; correct?

A.  They leave the discretion up to the officer on

## Page 62

how they want to make entry.

Q.  In that particular situation, did the landlord articulate to you, "Go in there, however you need"?

A.  Yeah.  Basically, our only option on that one was kicking the door in.

Q.  In this sentence that we have been talking about, it talks about the existence of voluntary consent.  Can you explain to me what you understand "voluntary consent" to mean?

A.  Without threat, I guess.  It's voluntary.  The homeowner has the decision to choose whether they want to provide consent or not.

Q.  In your training, what types of things do you understand to constitute threat?

A.  I guess, if you were in a scenario where, like, if you don't provide us consent, we are going to arrest you.

Q.  Is there some sort of standard or some sort of guidance that you have learned during your training to help you, as the officer, walk that appropriate line between getting voluntary consent and not being threatening?

A.  Yes.

Q.  Explain to me what the standard that you understand to exist is.

## Page 63

A.  Laying out the facts versus telling somebody, "I'm going to do this if you don't," you know, are two completely different things.  If you lay out the facts of the case -- you know, these are the facts.  This is what we have.

For example, if your house smells like marijuana, you can cooperate with the police.  You can consent to a search, and we will recover the drugs; or we can go apply for a search warrant.  Those are the facts.

Q.  Okay.

A.  We can do either of those.  If you, say, open the door or we are getting a search warrant -- getting and applying are two different things.  That's some of the training.  It's just wording, basically.

Q.  So laying out the facts versus telling the person from whom you are trying to get consent, "If you don't consent, this is what is going to happen"?

A.  Correct.

Q.  If you would, turn to the next page.  This is page '567 of Exhibit 3.  Down on paragraph H, it talks a little bit about voluntary consent.

It says:  "Consent must be given voluntarily. If an officer requests consent from a citizen under circumstances which a reasonable person would consider



EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

SHANIZ WEST, an individual,  )
                           )
      Plaintiff,      )
                           )
      v.            ) Case No. 1:16-cv-359
                           )
CITY OF CALDWELL; CITY OF    )
CALDWELL POLICE DEPARTMENT;  )
FORMER CHIEF CHRIS ALLGOOD in  )
his official and individual    )
capacity; SERGEANT DOUG     )
WINFIELD in his official and   )
individual capacity;      )
LIEUTENANT DEVIN RILEY in his  )
official and individual     )
capacity; and DOES I-X,    )
                           )
      Defendants.    )
                           )

## DEPOSITION OF MATT RICHARDSON

Naylor & Hales, P.C.
950 West Bannock, Suite 610
Boise, Idaho

Tuesday, January 3, 2017
3:00 p.m.

QnA COURT REPORTING, LLC
Tauna K. Tonks, CSR, RPR
Idaho CSR No. 276
P.O. Box 1058, Eagle, Idaho 83616
E-mail: realtimeQnA@msn.com
(ELECTRONIC COPY)   208.484.6309 | 208.286.7426 (fax)

**DEPOSITION OF DETECTIVE MATT RICHARDSON (1.3.2017)**

## Page 60

1      (Resume playing of the Audio 2 recording.)

2      Q. (BY MS. RAINEY) "Oh, Shaniz is walking up."

3  Is that what you heard?

4      A. Yes.

5      Q. Whose voice is that?

6      A. That would be Hoadley.

7      Q. Hoadley's. Is it fair to say, from what you

8  just listened to, that at the time Shaniz approached the

9  home, you were -- the group of officers that was engaged

10  in that conversation was about to breach her door?

11      A. I don't know if we had come to that decision

12  yet.

13      Q. Okay. But you were getting close to that

14  decision?

15      A. Possibly, yes.

16      Q. Okay.

17      (Resume playing of the Audio 2 recording.)

18      Q. (BY MS. RAINEY) Somebody says: "What's your

19  name"; correct?

20      A. Yes.

21      Q. Is that you?

22      A. Yes.

23      (Resume playing of the Audio 2 recording.)

24      Q. (BY MS. RAINEY) We hear a response "Shaniz

25  West"; correct?

DEPOSITION OF DETECTIVE MATT RICHARDSON (1.3.2017)

## Page 61

1      A. Yes.

2      Q. Do you know where, relative to her home, you

3  were engaging in a conversation with her?

4      A. It was on a sidewalk.

5      Q. Was it the sidewalk immediately in front of

6  her house, or was it across the street?

7      A. I don't remember.

8      Q. Do you recall what she was doing when she

9  approached the house?

10      A. I don't.

11      Q. Do you recall whether she was walking or

12  driving?

13      A. She was walking.

14      Q. Okay. Do you recall if she was alone?

15      A. I think she had a baby stroller, if I'm not

16  mistaken.

17      Q. Did she have any other children with her?

18      A. I don't remember.

19      (Resume playing of the Audio 2 recording.)

20      Q. (BY MS. RAINEY) "Where is Fabian at?" Is

21  that your voice?

22      A. That's me.

23      Q. Okay.

24      (Resume playing of the Audio 2 recording.)

25      Q. (BY MS. RAINEY) Can you make out what she

DEPOSITION OF DETECTIVE MATT RICHARDSON (1.3.2017)

## Page 62

1  said?

2      A. "He might be inside," I think is what she

3  said.

4      Q. Okay. That's what I heard as well.

5      (Resume playing of the Audio 2 recording.)

6      Q. (BY MS. RAINEY) You say: "He might be

7  inside," was your response; correct?

8      A. I didn't hear it. Do you want to replay it?

9      Q. Yes, I will.

10      (Resume playing of the Audio 2 recording.)

11      Q. (BY MS. RAINEY) She says: "He might be

12  inside"; correct?

13      A. Yes.

14      (Resume playing of the Audio 2 recording.)

15      Q. (BY MS. RAINEY) You say: "Is he inside," and

16  she responds again: "He might be"; correct?

17      A. Yes.

18      (Resume playing of the Audio 2 recording.)

19      Q. (BY MS. RAINEY) You say: "Might or yes";

20  correct?

21      A. Yes.

22      (Resume playing of the Audio 2 recording.)

23      Q. (BY MS. RAINEY) You say: "Okay. Let me tell

24  you this. He's got a felony warrant for his arrest;

25  okay?"

DEPOSITION OF DETECTIVE MATT RICHARDSON (1.3.2017)

## Page 63

1      A. Yes.

2      (Resume playing of the Audio 2 recording.)

3      Q. (BY MS. RAINEY) You say: "If you harbor him,

4  you're going to go to jail for felony harboring";

5  correct?

6      A. Yes.

7      (Resume playing of the Audio 2 recording.)

8      Q. (BY MS. RAINEY) She says: "What, if I'm

9  armed?" Is that what you heard?

10      A. I didn't hear it clearly.

11      Q. Let me replay it.

12      (Resume playing of the Audio 2 recording.)

13      THE WITNESS: I don't know what she said

14  there.

15      Q. (BY MS. RAINEY) She's not clear on what

16  you're saying?

17      A. Yeah.

18      Q. Okay.

19      (Resume playing of the Audio 2 recording.)

20      Q. (BY MS. RAINEY) You say: "If he's in there,

21  and you're not telling us, you can get in trouble for

22  that. Do you understand?"

23      A. Yes.

24      (Resume playing of the Audio 2 recording.)

25      Q. (BY MS. RAINEY) And you ask again: "Is he in

DEPOSITION OF DETECTIVE MATT RICHARDSON (1.3.2017)

## Page 64

1  there"; correct?
2      A. Correct.
3          (Resume playing of the Audio 2 recording.)
4      Q. (BY MS. RAINEY) The next thing we hear is you
5  saying: "Okay. Do you have a key to the front door?"
6      A. Yes.
7      Q. Do you recall what happened next?
8      A. I don't recall.
9      Q. Okay.
10         (Resume playing of the Audio 2 recording.)
11     Q. (BY MS. RAINEY) She says: "He has the top
12 lock locked"; correct?
13     A. I think so.
14     Q. Listen to it again.
15         (Resume playing of the Audio 2 recording.)
16     Q. (BY MS. RAINEY) "He has the top lock locked"?
17     A. Yes.
18         (Resume playing of the Audio 2 recording.)
19     Q. (BY MS. RAINEY) "21101, Shaniz is advising
20 he's inside"; correct?
21     A. Correct.
22     Q. Is that based on her comment that he had the
23 top lock locked?
24     A. Yes.
25         (Resume playing of the Audio 2 recording.)
         DEPOSITION OF DETECTIVE MATT RICHARDSON (1.3.2017)

## Page 65

1      Q. (BY MS. RAINEY) "When was the last time you
2  talked to him?" Did you hear that?
3      A. I didn't hear it, no.
4          (Resume playing of the Audio 2 recording.)
5      Q. (BY MS. RAINEY) Is that what the question
6  was?
7      A. That's what it sounded like, yeah.
8      Q. Okay. And then the response?
9      A. That wasn't me, though.
10     Q. Who was it?
11     A. Sounded like Hoadley.
12     Q. Okay.
13         (Resume playing of the Audio 2 recording.)
14     Q. (BY MS. RAINEY) I can't make out what she's
15 saying other than something about this morning.
16     A. That's what it sounds like, yeah.
17         (Resume playing of the Audio 2 recording.)
18     Q. (BY MS. RAINEY) "Well, when was the last time
19 you saw him?" Is that what you heard?
20     A. I didn't hear it.
21         (Resume playing of the Audio 2 recording.)
22     Q. (BY MS. RAINEY) Someone says: "So how
23 certain are you that he's in there"?
24     A. Yeah, that's me.
25     Q. Do you know what was said just prior to that?
         DEPOSITION OF DETECTIVE MATT RICHARDSON (1.3.2017)

## Page 66

1      A. I don't.
2      Q. Listen to it one more time.
3          (Resume playing of the Audio 2 recording.)
4      Q. (BY MS. RAINEY) Okay. So the question is:
5  "So you're for certain that he's in there," and then it
6  says: "She's 100 percent positive he's in there";
7  correct?
8      A. Yes.
9      Q. But we don't hear her voice between those two
10 statements; is that correct?
11     A. Correct.
12         (Resume playing of the Audio 2 recording.)
13     Q. (BY MS. RAINEY) The question is: "What kind
14 of gun did he have"; correct?
15     A. Yes.
16         (Resume playing of the Audio 2 recording.)
17     Q. (BY MS. RAINEY) Did you hear the response?
18     A. I did not.
19         (Resume playing of the Audio 2 recording.)
20     Q. (BY MS. RAINEY) Did you hear her say: "It's
21 a BB gun"?
22     A. No, I did not.
23     Q. You couldn't hear it?
24     A. Huh-uh.
25         (Resume playing of the Audio 2 recording.)
         DEPOSITION OF DETECTIVE MATT RICHARDSON (1.3.2017)

## Page 67

1      Q. (BY MS. RAINEY) The response is: "Are you
2  certain?"
3      A. Yes.
4          (Resume playing of the Audio 2 recording.)
5      Q. (BY MS. RAINEY) You say: "Did he say that,"
6  and the response was: No. I seen it. It's my son's BB
7  gun"; correct?
8      A. Yes.
9      Q. Okay.
10         (Resume playing of the Audio 2 recording.)
11     Q. (BY MS. RAINEY) "Do you know if he had
12 anything else on him"; correct?
13     A. Yes.
14         (Resume playing of the Audio 2 recording.)
15     Q. (BY MS. RAINEY) You respond: "She said it
16 was her son's BB gun"; correct?
17     A. Yes.
18         (Resume playing of the Audio 2 recording.)
19     Q. (BY MS. RAINEY) And then there's a bunch of
20 voices in the background there; correct?
21     A. Correct.
22     Q. Do you recall whether or not Shaniz gave you
23 the keys to the house?
24     A. I don't recall.
25     Q. Okay. Based on that conversation that we just
         **DEPOSITION OF DETECTIVE MATT RICHARDSON (1.3.2017)**

## Page 68

1  listened to, do you recall whether or not Shaniz
2  consented to you going into the home?
3     A. Yes.
4     Q. Okay. Was it based on that portion of the
5  conversation or something that happened subsequent?
6     A. It's something that happened after.
7     Q. Okay. Let's keep listening.
8     (Resume playing of the Audio 2 recording.)
9     Q. (BY MS. RAINEY) I hear someone saying
10  something about SWAT. Did you hear that back there?
11     A. Yes.
12     Q. Okay. Did you personally at any time tell
13  Shaniz that you would call SWAT to enter the home?
14     A. No, I did not.
15     Q. Do you know if anybody did?
16     A. I don't know.
17     (Resume playing of the Audio 2 recording.)
18     Q. (BY MS. RAINEY) "I'll let him make the call."
19  Was that you?
20     A. Yes.
21     Q. What were you referring to?
22     A. I have no idea.
23     (Resume playing of the Audio 2 recording.)
24     Q. (BY MS. RAINEY) There's kind of singing
25  noises being made. Is that you?

DEPOSITION OF DETECTIVE MATT RICHARDSON (1.3.2017)

## Page 69

1     A. Yes.
2     (Resume playing of the Audio 2 recording.)
3     Q. (BY MS. RAINEY) "Do they have somewhere where
4  they can go?" Is that your voice?
5     A. Yes.
6     Q. And is that actually what you said?
7     A. Yes.
8     Q. What are you talking about there?
9     A. I'm not 100 percent sure.
10     Q. Okay.
11     (Resume playing of the Audio 2 recording.)
12     Q. (BY MS. RAINEY) So you say: "Shaniz,
13  let me ask you this. Do we have permission to get
14  inside your house and apprehend him"; correct?
15     A. Yes.
16     Q. Okay. At that point do you know whether or
17  not she had already given you the keys?
18     A. I don't remember.
19     (Resume playing of the Audio 2 recording.)
20     Q. (BY MS. RAINEY) We don't hear any response;
21  correct?
22     A. Correct.
23     Q. We hear someone saying: "You're doing the
24  right thing. You know that"; correct?
25     A. Yes.

DEPOSITION OF DETECTIVE MATT RICHARDSON (1.3.2017)

## Page 70

1     Q. Is that your voice?
2     A. Yes.
3     (Resume playing of the Audio 2 recording.)
4     Q. (BY MS. RAINEY) "She wants to know if she
5  can" --
6     A. "Go walk around."
7     Q. Okay. So the statement was: "She wants to
8  know if she can go walk around"; correct?
9     A. Correct.
10     (Resume playing of the Audio 2 recording.)
11     Q. (BY MS. RAINEY) Whose voice asked that
12  question? "She wants to know if she can go walk
13  around," whose voice was that?
14     A. I think it was Hoadley. I'm not --
15     Q. And then -- oh, go ahead.
16     A. I'm not positive, but I think it was him.
17     Q. And then your response was: "I prefer that
18  she stay right here"; correct?
19     A. Correct.
20     Q. Why is that?
21     A. Because she had consented to us going inside
22  of her residence. And I wanted to keep her there. That
23  way she could revoke consent at any time.
24     Q. Did you advise her of that?
25     A. No, I did not.

DEPOSITION OF DETECTIVE MATT RICHARDSON (1.3.2017)

## Page 71

1     Q. Okay. There's actually a form that you have
2  at the department if someone gives consent to search
3  their -- search anything; isn't that correct?
4     A. Yes.
5     Q. Did you use that form with Shaniz?
6     A. No.
7     Q. Why not?
8     A. Not required to.
9     Q. Okay. What's the protocol for when you do or
10  don't use that form?
11     A. My personal, what I always did, is if I was
12  actually searching property for drugs or something like
13  that, then I use it. If I'm not, if I'm just going in
14  to search for a person, I don't particularly use it.
15     Q. And where does that personal policy -- well,
16  how did you come about developing that personal policy?
17     A. Just a preference.
18     Q. Okay.
19     (Resume playing of the Audio 2 recording.)
20     Q. (BY MS. RAINEY) "Do you have someone right
21  here that you know that you could sit with"; correct?
22     A. Yes.
23     Q. And is that your voice?
24     A. Yes.
25     (Resume playing of the Audio 2 recording.)

DEPOSITION OF DETECTIVE MATT RICHARDSON (1.3.2017)

EXHIBIT D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

---

SHANIZ WEST, an individual,   )
                         )
     Plaintiff,     )
                         )
     v.            ) Case No. 1:16-cv-359
                         )
CITY OF CALDWELL; CITY OF    )
CALDWELL POLICE DEPARTMENT;   )
FORMER CHIEF CHRIS ALLGOOD in  )
his official and individual   )
capacity; SERGEANT DOUG     )
WINFIELD in his official and   )
individual capacity;      )
LIEUTENANT DEVIN RILEY in his  )
official and individual     )
capacity; and DOES I-X,    )
                         )
     Defendants.    )

---

## DEPOSITION OF ALAN SEEVERS

Naylor & Hales, P.C.
950 West Bannock, Suite 610
Boise, Idaho

Tuesday, December 13, 2016
9:15 a.m.

QnA COURT REPORTING, LLC
Tauna K. Tonks, CSR, RPR
Idaho CSR No. 276
P.O. Box 1058, Eagle, Idaho 83616
E-mail: realtimeQnA@msn.com
(ELECTRONIC COPY)   208.484.6309 | 208.286.7426 (fax)

DEPOSITION OF LIEUTENANT ALAN SEEVERS (12.13.2016)

## Page 32

1 department is attempting to protect in creating its plan
2 is the hostage?
3   A. Yes.
4   Q. And the last priority of who the police is
5 attempting to protect is the suspect?
6   A. Yes.
7   Q. How does this priority of life factor into how
8 this particular tactical plan was developed?
9   A. So there were no hostages or uninvolved
10 civilians; so that leaves us with officers and suspects.
11 So this is answering your question on why we did not
12 just walk into the house and arrest him.
13       Based on the information we were given that he
14 was a wanted felon, had committed aggravated assault
15 that day, and was armed, the officers' lives are
16 important enough that we're not going to risk an officer
17 just to go in and get shot to make this arrest.
18   Q. What was the information that you'd received
19 regarding him having committed aggravated assault that
20 day?
21   A. Threatened somebody with a gun.
22   Q. From whom did you receive that information?
23   A. Sergeant Hoadley.
24   Q. Do you know where Sergeant Hoadley got the
25 information?

## Page 33

1   A. No.
2   Q. Is Sergeant Hoadley on the SWAT team in any
3 capacity?
4   A. He is not.
5   Q. Okay. What was Sergeant Hoadley's
6 relationship to this incident?
7   A. He, I believe, was the patrol supervisor that
8 day.
9   Q. Okay. So if I'm understanding your testimony
10 correctly, because you had information that day that
11 Mr. Salinas was a wanted felon, he had committed
12 aggravated assault that day, and he was armed, at no
13 point did the tactical plan involve the officers just
14 using the key to enter the home to see if they could
15 apprehend Mr. Salinas?
16   A. No. That was a possibility, but that was the
17 last -- would be the last resort. It would not be the
18 initial action.
19   Q. Using the key would be the last resort?
20   A. Yes.
21   Q. Okay. Walk me through what would the process
22 be up to using the key to enter the home. What were the
23 steps leading up to that potential as the last resort?
24   A. "Contain and callout."
25   Q. Okay.

## Page 34

1   A. Basically, our presence and clearly stating
2 that he's under arrest, and the goal there is just
3 surrender. If that doesn't work, if he doesn't come out
4 voluntarily, introduce the chemical munitions into the
5 house to make it uncomfortable enough that he'll want to
6 come out, and submit to the arrest.
7   Q. Okay.
8   A. Next step after that is usually sending
9 officers in sometimes with a K-9 or behind a K-9 to
10 search.
11   Q. And then if those three steps don't work, then
12 using the key to enter the home?
13   A. Well...
14   Q. Because you said that would be the last
15 resort; so it kind of seems like illogical to me to --
16   A. If we have a key, that third step of when the
17 officer is going with or without the K-9 would include,
18 if we had a key to the house, using the key to get in.
19   Q. Okay. So the use of the key would be the
20 third step after the "contain and callout" had occurred
21 and the introduction of chemical munitions had occurred?
22   A. Yes.
23   Q. And then you use the key to enter the home,
24 usually in connection with a K-9; is that correct?
25   A. If it's available, yes.

## Page 35

1   Q. All right. Who on -- is there someone on the
2 SWAT team who is responsible for maintaining
3 communications with Ms. West during this incident?
4   A. Nobody on SWAT.
5   Q. Okay. Is there somebody who is not on SWAT
6 responsible for maintaining communications with
7 Ms. West?
8   A. I don't know that that is an assigned task. I
9 know that in this instance, I believe that Sergeant
10 Hoadley did maintain contact with her.
11   Q. Okay. And you say it's not an assigned task.
12 Explain to me what you're discussing there.
13   A. I don't believe we have an assignment to, I
14 guess, create a liaison with the homeowner. I would say
15 that if the homeowner is present, it would always
16 happen, but I don't know that we've ever identified that
17 as a task. It's not one for the SWAT team; so it's
18 outside my umbrella.
19   Q. Okay. And so within your umbrella in the SWAT
20 team, communications with -- let me -- well, here's one
21 of those bad questions that I do.
22       If I understand you correctly, communications
23 with the homeowner does not fall within the umbrella of
24 what the SWAT team is supposed to be doing; is that
25 correct?

Page 76

1  for Department of Corrections?
2      A. He did as of -- I'm certain he does. I
3  haven't heard otherwise. He is not assigned to our
4  Street Crimes Unit at this time.
5      Q. Okay. That was my next question; so good job.
6      MS. RAINEY: I think these other reports might
7  look the same; so...
8      (Exhibit 7 was marked.)
9      Q. (BY MS. RAINEY) I'm handing you what the
10 court reporter has marked as Exhibit 7, and this was
11 filled out by C. Sperry. Do you see that?
12     A. Yes.
13     Q. And what is C. Sperry's role in the Caldwell
14 Police Department?
15     A. She is a corporal assigned to a patrol team;
16 however, she may have been -- on this date may have been
17 assigned to Investigations as a detective. And she has
18 an ancillary role as a crisis negotiator.
19     Q. Okay. When you say "an ancillary role as a
20 crisis negotiator," what do you mean by that?
21     A. It's an extra assignment as needed. So it's
22 used as an on-call basis.
23     Q. So when you were talking about your crisis
24 negotiation team, is she considered part of that team?
25     A. She is.

DEPOSITION OF LIEUTENANT ALAN SEEVERS (12.13.2016)

Page 77

1      Q. Okay. What's her first name?
2      A. Chelle.
3      Q. Can you spell that?
4      A. C-H-E-L-L-E.
5      Q. Okay. Down towards the bottom, second to the
6  last paragraph there, it indicates she was -- I'm
7  starting with the second sentence of that second to the
8  last paragraph. "She was also concerned about her house
9  being damaged and would be upset if it was because she
10 gave the officers her keys to the house." Do you see
11 that?
12     A. Yes.
13     Q. "She also wanted to know if she and her
14 children would be able to return to the house tonight."
15 Do you see that?
16     A. Yes.
17     Q. Did you have a conversation with anyone that
18 evening about Ms. West's concern about her house being
19 destroyed?
20     A. No.
21     Q. Did you have any conversations with anybody
22 that evening about any concerns that Ms. West had about
23 the police operations at her home?
24     A. It seems like I overheard part of the
25 conversation that somebody was being tasked with repairs

DEPOSITION OF LIEUTENANT ALAN SEEVERS (12.13.2016)

Page 78

1  to the house.
2      Q. What do you recall about that conversation?
3      A. That Lieutenant Wright was tasked with that
4  assignment.
5      Q. Was that the evening of the incident?
6      A. Probably.
7      Q. And who is Lieutenant Wright?
8      A. A lieutenant assigned -- well, at this time he
9  was assigned to the Operations Division.
10     Q. What's Lieutenant Wright's first name?
11     A. David.
12     Q. You mentioned that he was tasked with repairs
13 to the house. Do you know if anybody was tasked with
14 coordinating with Ms. West regarding damage to the
15 personal possessions within the house?
16     A. I don't remember that, no.
17     Q. You don't know one way or the other --
18     A. No.
19     Q. -- whether that occurred?
20     Do you know whether it's the policy of the
21 Caldwell Police Department to address damage to personal
22 property that occurs through a search conducted by the
23 Caldwell Police Department?
24     A. In the past few years it's become our practice
25 if, during the course of police activity -- the wording

DEPOSITION OF LIEUTENANT ALAN SEEVERS (12.13.2016)

Page 79

1  that I recall is if we break a door, we're going to go
2  out and fix the door; so...
3      Q. If someone gives consent, are they able to
4  later withdraw that consent?
5      A. Absolutely.
6      Q. Okay. How does the Caldwell Police Department
7  go about advising someone about how to withdraw the
8  consent?
9      A. It would be on that Permission to Search form
10 that we discussed earlier.
11     Q. Okay. That Permission to Search form would
12 explain to someone how they later withdraw their
13 consent?
14     A. Yes.
15     Q. Okay. Is it safe for children to reenter a
16 home that has been -- where tear gas has been sprayed
17 into it?
18     A. You have to define "safe."
19     Q. Okay. Does it pose a hazard to their health
20 in any way?
21     A. I think the only -- it could be uncomfortable.
22 It's in, I believe, a powdered form, and it would -- it
23 could cause watering eyes, for instance, or a runny
24 nose, and the sensation that it's difficult to breathe.
25     Q. Do you know if it causes any health problems

DEPOSITION OF LIEUTENANT ALAN SEEVERS (12.13.2016)

## CALDWELL POLICE DEPARTMENT POLICY MANUAL

| | |
|---|---|
| **SUBJECT:** Consent Searches | **NUMBER:** 02.040 |
| **EFFECTIVE DATE:** 09/20/02 | **REVIEWED YEARLY** |
| **AMENDS/SUPERSEDES:** NEW | **APPROVED:** _(signature)_ <br> **Chief of Police** |

### 1. PURPOSE

The purpose of this policy is to define consent searches and what is required of CPD officers making a consent search.

### 2. POLICY

The department recognizes that consent searches are a valid and useful law enforcement tool if they are used with discretion. Officers of the Caldwell Police Department may execute consent searches. Officers shall adhere to the directives outlined in this policy when doing a consent search.

### 3. DEFINITIONS

A. SEARCH – Police action is termed a search where (1) there is a "prying into hidden places by the police officer" which (2) the person whose premises or person is being searched as a reasonable expectation of privacy.

B. PROBABLE CAUSE – According to the Supreme Court, "Probable cause exists where the facts and circumstances within their (the arresting officer's) knowledge and of which they had reasonable trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed."

C. REASONABLE SUSPICION- Reasonable suspicion involves a standard less than probable cause, generally defined by the courts as a circumstance or collection of circumstances that would lead a trained, experienced officer to believe that criminal activity may be afoot.

D. CONSENT SEARCH - A search warrant is not necessary where a person who has authority or control over the thing or place searched consents to the search. Note that the officer doesn't have to have reasonable suspicion nor probable cause to make a consent search: he or she may merely ask for permission from someone with control over the premises. If that person grants permission, the search may take place. The sole justification for a consent search is the existence of voluntary consent.

1

EXHIBIT __3__
NAME: _Seevers_
DATE: _12-13-16_
QnA Court Reporting, LLC

CPD# 02.040

**CALDWELL 566**

# CALDWELL POLICE DEPARTMENT POLICY MANUAL

## 4. RULES

Officers making a consent search shall observe the following rules:

A. Generally, the person granting consent must use, access, or control the property.

B. If two people have joint ownership of property, either may give consent.

C. A landlord, including a hotel or motel manager, cannot consent to a search of a tenant's premises, unless the tenant has been evicted or has abandoned the property.

D. A husband or wife, or one member of a cohabiting unmarried couple, may consent to a search of areas in common ownership or use.

E. A parent may consent to a search of premises occupied by a dependent child.

F. An employee cannot give valid consent to a search of his employer's premises unless he has been left in custody of the premises.

G. An employer may generally consent to a search of premises used by employees, except premises used solely by an employee (e.g., a locker).

H. Consent must be given voluntarily. If an officer requests consent from a citizen under circumstances which a reasonable person would consider coercive, then officers must seek a warrant. The officer may have the burden of demonstrating that consent was voluntary.

I. A person has the right to refuse to give consent to search. A person giving consent may limit the scope or duration of the search. The consent may be withdrawn at any time during the search. The search must cease if consent is revoked. Officers are not required to notify the consenting person of these rights prior to requesting consent unless the person inquires, and then the officer must answer truthfully.

J. Officers shall complete a *Permission to Search* form and have the consenting person sign it. Officers shall use an audio recorder to document the conversation with the consenting person. All consent searches shall be documented with a complaint report.

K. Supervisors are responsible for ensuring that consent searches are made for valid reasons.

CPD# 02.040

CALDWELL 567

# EXHIBIT E

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

SHANIZ WEST, an individual,   )
                    )
    Plaintiff,        )
                    )
    v.            ) Case No. 1:16-cv-359
                    )
CITY OF CALDWELL; CITY OF    )
CALDWELL POLICE DEPARTMENT;   )
FORMER CHIEF CHRIS ALLGOOD in  )
his official and individual    )
capacity; SERGEANT DOUG      )
WINFIELD in his official and   )
individual capacity;       )
LIEUTENANT DEVIN RILEY in his  )
official and individual      )
capacity; and DOES I-X,     )
                    )
    Defendants.       )
_____)

## DEPOSITION OF DOUG WINFIELD

Naylor & Hales, P.C.
950 West Bannock, Suite 610
Boise, Idaho

Tuesday, December 13, 2016
1:00 p.m.

QnA COURT REPORTING, LLC
Tauna K. Tonks, CSR, RPR
Idaho CSR No. 276
P.O. Box 1058, Eagle, Idaho 83616
E-mail: realtimeQnA@msn.com
(ELECTRONIC COPY)   208.484.6309 | 208.286.7426 (fax)

**DEPOSITION OF SERGEANT DOUG WINFIELD (12.13.2016)**

## Page 29

like. We relied on officers on scene to give us
descriptions of the house, the location of doors and
windows. We obtained information on the name of the dog
and specifics on the dog. We confirmed that no one else
was supposedly in the house, which dictated the tactics
that I chose to use.

And based on that information that I had
received and the intel that was coming in at the time,
we developed a plan.

Once I was at the station, there was radio
transmissions over the air from officers on scene. I
don't recall who they were that said it, but I heard it
with my ears over the radio that one of the officers on
scene heard movement inside of the house.

We had information that someone at the front
of the residence, an officer at the front of the
residence, heard what they believed was a front door
locking and movement in the garage. And that all went
into the consideration on the likelihood of someone
being in there and what tactics we should use.

**Q. And is it fair to say that the information you
received about noise in the house and the door locking,
these were all things that caused you to believe that,
in fact, the suspect likely was in the home?**

A. Yes.

## Page 30

**Q. Or at least somebody was in the home; right?**

A. Somebody was in the home.

**Q. Sure. Nobody told you anybody else was there
except him; right?**

A. That's correct.

Joey Hoadley told me that he knew that the
guy -- that the person was in the house. I've worked
with Joey 15 years, and I believed him, and Lieutenant
Seevers agreed.

**Q. Did Hoadley tell you why he had such a firm
conviction the guy was in the house?**

A. Other than what I told you, no.

**Q. So he would have heard the same transmissions
you heard?**

A. He should have, if he had his radio. I don't
know if he heard it, but I know I heard it.

**Q. Okay. Can you briefly just explain to me, if
you remember, what your tactical plan entailed?**

A. Yes. Based on the fact that all the
information we had was that this person was suicidal,
this person was barricaded, this person possibly had
stolen guns, based on the fact that the family members
were concerned that he was suicidal, who ultimately
probably know him better than anybody else, my original
plan was not to go in that house unless we had

## Page 31

absolutely had to.

The idea was to get him to come out because we
were at a disadvantage. I've never been in that house,
and I don't know if any of my guys have been in that
house; so it's a disadvantage for us to go in. So the
idea was to get him to come out, which is the way the
majority of the time we do all operations. It's called
"contain and callout."

So the initial plan was to contain and call
out the person inside. And if he didn't come out, the
next plan was to introduce a gas environment that would
force him to come outside. Because going inside, again
we're at a disadvantage. Number two, there's a large
dog in there, which aren't good situations to be
involved with. And we didn't know the layout of the
house, and there could have been someone else in there
too. So it's never a good idea unless you absolutely
have to.

**Q. And did your tactical plan include, like,
another step in the event introducing gas didn't --**

A. Yes. So once gas is introduced, we have a
waiting period to let the gas do its job. It doesn't
instantly work. It's got to dissipate or go throughout
the structure. We generally will introduce it in areas
where you believe someone to be, in hopes of gaining

## Page 32

compliance.

Now, once the gas had a certain amount of
time, then the next option would be to do a limited
breach, what we call limited breach, which means we will
try to make entry through our point of entry, which in
this case was the front door, and then we will hold and
continue to call out at that point.

The secondary entry point -- when you make a
tactical plan, you have your primary entry point, and
during the tactical process, you come up with a
secondary entry point. And the secondary entry point
was going to be the back door.

**Q. Anything else you remember about the tactical
plan?**

A. As it went on, I guess, are you talking
about -- that right there was the initial plan, was we
have consideration. The consideration was: Is we don't
want to go in that house if we don't have to because
we're at a disadvantage. We have got all the
indications, like I explained, that he's suicidal, from
the family, missing guns that are stolen. He's
apparently armed.

And honestly, if someone tells me that they
are packing a BB gun, handgun, I'm not going to rely
100 percent that that's true because it might not be.

## Page 33

It could be a .22 or something bigger.

I did not want to go in that house. I didn't want my guys to go in that house.

**Q. Okay. I now understand what the contents of the initial tactical plan is, and I now understand the reasoning for why it was created the way it was.**

**What's its format? Is this like you draw bullet points on a white board; do you pull out a piece of paper; is it all in your head? I mean, when you talk about creating the tactical plan, what does it look like?**

A. I can tell you. Every tactical plan that I create -- and it's not just me; this is how tactical plans are created.

**Q. Right.**

A. Tactical plans are created based on the priorities of life, and I'll explain that.

Priority of life number one would be a hostage. That means that if we are dealing with a hostage situation, their priority of life is higher than an officer's priority of life. That's why we press those things, we go in on those things. We have to go in on a hostage situation.

Priority number two would be innocent bystanders. Innocent bystanders have a higher priority

## Page 34

of life than officers do. Then it's officer, and then it's suspect. Now, that does not mean that suspects have a lower priority of life than officers, but what that means is that dictates what type of tactics we use.

So if on this scenario there was children in there that were being held against their will, we would have went in much quicker. We wouldn't have gassed the place. We would have went in much quicker because those kids would have had a higher priority of life than the officers and the suspects.

Because a suspect that's barricaded, time is on our side. There's no reason for us to go in there at this point. We want that person to come out, especially when we had the information that we did, that Sergeant Hoadley provided to me and Lieutenant Seevers.

**Q. The actual tactical plan that you have at the station before you leave for the scene, do you write that on a form, or do you write on a chalkboard?**

A. It can be two ways.

If it's a preplanned event where we know tomorrow morning we're going to be doing a search warrant for drugs at this house, it's all typed out. We have a spreadsheet, it's an attachable lined spreadsheet, and it tells who is going to be there, what everybody's assignment is, what's the route we're going

## Page 35

to get there, what channel we're going to be operating on, who is doing crisis negotiation, where the command post is going to be, for downed officer rescue, what the route is to and from. That's in a tactical plan.

Or if you get called out on a hot situation, I write it up on the board. It's time consuming to type everything out when we've got containment on this and the family is concerned this guy is going to die, and, you know, we need to get out there.

In this situation, it was done on a board.

**Q. Okay.**

A. And all it does is it gives what your assignment is. There's no handwritten, you know, narrative; there's no reports in there. It's just this is what everybody's assignment is; this is who is in charge of the arresting; this is who is in charge of front containment, back containment, who's the crisis negotiator, what channel we're working on, what the routes are.

So that's a tactical plan.

**Q. Okay. That helps me a lot. I've never made one in my life; so it's hard sometimes in my job to ask questions of people that have spent their whole life doing something, and I don't know anything about it. But I understand that now.**

## Page 36

**And I presume the training helps you. Like if you tell someone "Hey, your assignment is this," you don't have to tell them much more because they have been trained to know what to do when they are in that job; correct?**

A. Correct.

**Q. Okay. I think I have a better understanding on how this works, then.**

**So do you remember how many times you talked to Sergeant Hoadley prior to leaving for the scene?**

A. I don't recall. I don't remember talking to him maybe once or twice. That's not something typical that I would do, you know. So I probably talked to him once. I may have talked to him twice, but I know I talked to him once.

**Q. Do you remember if you talked to him on scene?**

A. I don't believe I would have talked to him on scene. And I don't remember, but I don't believe I would have because I was in the armored truck and -- or not the armored truck. I was with the team on our transportation, and Sergeant Hoadley was someplace else. I don't know where he was.

**Q. Okay. And when you got on scene, you did end up with Lieutenant Seevers in the armored truck; right?**

A. Yes. He was the driver.

## Page 61

1    A. Mm-hmm.

2    Q. Is one of the reasons that the time elapses

3  over two hours, is that because you had been told that

4  the property was contained and that you kind of had it

5  surrounded?

6    A. No. No, this would have to do with the team

7  showing up. You page out the team, and they respond;

8  they get their gear out. And then the tactical plan is

9  created, images are obtained, the team is briefed. They

10  do dry runs to practice, make sure everybody is in line,

11  and then drive out to the location.

12    Q. Okay.

13    A. This is not an exorbitant amount of time, just

14  based on experience I have with getting 13 people to

15  come in and be suited up and ready to go.

16    Q. So two hours and 23 minutes would be typical?

17    A. I'm saying that that is not, to me, that long

18  of time to plan it and initiate it.

19    Q. So do you remember what you did after you got

20  there? It says: "After SWAT had containment of the

21  residence, PA announcements were made."

22    Is that something that your unit would have

23  taken over from the patrols?

24    A. Yeah. PA announcements were done through our

25  team.

DEPOSITION OF SERGEANT DOUG WINFIELD (12.13.2016)

## Page 62

1    Q. Okay. And did you also relieve them of their

2  responsibility to contain the property? "Them" being

3  the patrolmen that were on scene?

4    A. Yeah. We have a containment element, which is

5  officers that are trained with us, and they would go in

6  and take over containment so that officers could be

7  relieved.

8    Q. So in reading your report, you give PA

9  announcements and there's no response from inside.

10    Then the next thing that your report says is:

11  "Gas was deployed into the residence through windows at

12  the back of the residence, through the garage door, and

13  through the front bedroom window, with no response from

14  inside."

15    A. Correct.

16    Q. Do you know how long you were on scene before

17  gas was deployed the first time?

18    A. I don't know.

19    Q. Okay. From the time you were on scene until

20  the gas was deployed, did you or any of the people under

21  your command have any discussions with my client about

22  the fact that gas was going to be deployed?

23    A. No.

24    Q. Do you know whether Sergeant Hoadley received

25  permission from my client to deploy tear gas into her

DEPOSITION OF SERGEANT DOUG WINFIELD (12.13.2016)

## Page 63

1  home?

2    A. No.

3    Q. It says "through the windows at the back of

4  the residence, through the garage door, and through the

5  front bedroom window." That's three locations.

6    I believe you told me earlier that you try to

7  deploy where you think the person might be hiding.

8  Did I get that right?

9    A. Yes.

10    Q. Okay. Do you know how many canisters of tear

11  gas were deployed the first time?

12    A. Well, they're -- it's a 12-gauge shotgun.

13  It's not tear gas; it's a different kind of gas. Tear

14  gas kind of refers to the military type of thing. This

15  was more of an irritant, pepper-based, like you would

16  carry on your police belt, OC type of thing. And

17  it's deployed through a shotgun, a 12-gauge shotgun.

18    So the person that's in charge of the gas

19  comes up with a plan. There's a formula, based on the

20  square footage, how much gas is deployed and the

21  dispersion rate. That's something that I don't decide.

22  That's based on their training and experience, based on

23  the environment that we're working in.

24    So I don't know, to answer your question. I

25  do not know how many shots of gas were introduced into

DEPOSITION OF SERGEANT DOUG WINFIELD (12.13.2016)

## Page 64

1  the house totally.

2    Q. Do you know which member of your team that day

3  was responsible for doing that calculation?

4    A. I can limit it to two, because we have two

5  people that are on gas. Jared Hoeksema, and I'll spell

6  that last name for you.

7    Q. Thanks.

8    A. H-O-E-K-S-E-M-A. And Aron Streibel, and I'll

9  spell that name for you. A-R-O-N and S-T-R-E-I-B-E-L.

10    Q. And just so I'm clear, and I think I am, you

11  would not have decided to deploy the gas in three

12  locations, and you would not have decided what those

13  three locations were, and you would not have decided how

14  much to deploy at each location. Did I understand all

15  that correctly?

16    A. That's correct. I would have known -- I knew

17  that they were going to deploy it into the garage

18  because one of the people reported hearing movement in

19  the garage. You try to deploy it where you think they

20  are. We obviously don't know where they are.

21    Bedrooms, where people stay, are generally a

22  good place to deploy it. And then in the main part of

23  house in an effort to limit movement. If someone is in

24  the bedroom, they are not going to come out into an open

25  area, generally speaking, if there's gas in there. So

DEPOSITION OF SERGEANT DOUG WINFIELD (12.13.2016)

Page 85

1     A. In the last five years, I don't recall if
2 I've reviewed it in the last five years.
3     Q. Okay. And the second sentence there under the
4 first paragraph in Section 5 says: "If a member is
5 uncertain of the meaning or intent of a rule, policy, or
6 procedure, it shall be his duty to seek clarification
7 from his immediate supervisor."
8     Do you remember at any point in time in the
9 last three years that you ever sought clarification from
10 your immediate supervisor as to any of the policies
11 contained in the Caldwell Police Policy Manual?
12     A. Yes.
13     Q. And what do you remember?
14     A. I was talking to Lieutenant Wright about a
15 pursuit policy question that we had.
16     Q. Can you think of any other time that that's
17 happened in the last three years that you remember?
18     A. Not that I remember in the last three years.
19     Q. Do you remember any of the officers, for whom
20 you're the immediate supervisor, ever at any point in
21 the last three years asking you to clarify any portion
22 of the policy manual?
23     A. Many times.
24     Q. Many times?
25     A. Yes.
    DEPOSITION OF SERGEANT DOUG WINFIELD (12.13.2016)

Page 86

1     Q. Okay. So how often would you say that
2 happens?
3     A. Anytime there's a use of force, anytime
4 there's a pursuit, anytime there's a question on search
5 and seizure, they are on my desk in a file. It sits on
6 top of my desk.
7     Q. When is the first time on August 11th -- well,
8 first, let me ask this. At any point on August 11th did
9 you personally enter Shaniz West's home?
10     A. Yes.
11     Q. And when did that happen?
12     A. After the team inside said that the house was
13 secure, cleared.
14     Q. Do you have any idea what time of night that
15 might have been?
16     A. I don't. I know it was dark, but I don't
17 recall.
18     MR. FISHER: Why don't you mark that as an
19 exhibit.
20     (Exhibit 10 was marked.)
21     Q. (BY MR. FISHER) Doug, I'm going to show you
22 what we have marked as Exhibit 10, which also it says
23 CPD 0010 at the bottom. Do you recognize what's
24 depicted in that picture?
25     A. I believe this is the house.
    DEPOSITION OF SERGEANT DOUG WINFIELD (12.13.2016)

Page 87

1     Q. Okay. What do you recall the interior
2 condition of the home to be when you finally went
3 inside?
4     A. In disarray.
5     Q. And can you elaborate on that?
6     A. I remember couches being moved, beds being
7 moved. Those are the things -- I remember seeing the
8 hole in the ceiling in the bedroom. I remember looking
9 at the windows. Those are the things that stand out
10 that I recall.
11     Q. And do you have any understanding of what the
12 gas that was deployed could do to material such as
13 clothing or furniture?
14     A. Yes.
15     Q. And what's your understanding of what that
16 could do to clothing or upholstery?
17     A. Clothing requires that it be washed. Couches
18 require that it be cleaned. It depends on the fabric,
19 to my understanding, but I know that it can be cleaned.
20 And the reason I know clothing is we go into gas
21 environments, and we wash our clothes, and it
22 decontaminates it. But I know that there is items a lot
23 of times that are just thrown away.
24     Q. As you look at Exhibit 10, I'm going to start
25 with the door. Is that the back door that you described
    DEPOSITION OF SERGEANT DOUG WINFIELD (12.13.2016)

Page 88

1 earlier as having had a gas shell deployed through it?
2     A. I believe so, yes.
3     Q. And you would agree with me -- or would you
4 agree with me that my client never gave anyone at the
5 Caldwell Police Department specific permission to shoot
6 a shell through that door?
7     A. Correct.
8     Q. Okay. And can we say the same for the various
9 windows depicted in this; that my client never gave
10 specific permission for someone to put a shell through
11 any of those windows?
12     A. Yes.
13     MR. FISHER: Please mark this.
14     (Exhibit 11 was marked.)
15     Q. (BY MR. FISHER) I'm going to show you what's
16 been marked as Exhibit 11. It looks like the same
17 house, different angle?
18     A. Yes.
19     Q. Can you tell me what the blue things are on
20 the ground under the window that we were not able to see
21 previously?
22     A. Those were pallets that were up against the
23 house. I don't know where they came from.
24     Q. Do you recall directing anyone to take any of
25 these pictures?
    DEPOSITION OF SERGEANT DOUG WINFIELD (12.13.2016)



EXHIBIT F

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

SHANIZ WEST, an individual, )
 )
 Plaintiff, ) No. 1:16-cv-359
 )
vs. )
 )
CITY OF CALDWELL; CITY OF )
CALDWELL POLICE DEPARTMENT; )
FORMER CHIEF CHRIS ALLGOOD, in his )
official and individual capacity; )
SERGEANT DOUG WINFIELD, in his )
official and individual capacity; )
LIEUTENANT DEVIN RILEY, in his )
official and individual capacity; )
and DOES I-X, )
 )
 Defendants. )
 )

## DEPOSITION OF CHRIS ALLGOOD

**Naylor & Hales, P.C.**
950 West Bannock Street, Suite 610
Boise, Idaho

**Friday, December 16, 2016**
Beginning at 11:30 a.m.

**QnA COURT REPORTING, LLC**
Lori A. Pulsifer, RDR, CRR, Idaho CSR

354

P.O. Box 1058, Eagle, Idaho 83616-1058
realtimeQnA@msn.com . QnAcourtreporting.

com

(ELECTRONIC COPY) 208.484.6309 . 208.286.7426 (fax)

Page 12

officer worked for.

Q. As part of this process, we have been given a copy of the Caldwell Police Department Policy Manual that was in effect at the time this incident occurred, which was August of 2014. Are you familiar with the Caldwell Police Department's Policy Manual?

A. I am.

Q. I am still discussing this with regard to training. While you were the Chief of Police with the Caldwell Police Department, who was responsible for maintaining the Policy Manual?

A. Alan Seevers was the one that, basically, took care of the Policy Manual, making sure we were up to date. The Caldwell Police Department is an accredited police department through the Idaho Chief of Police Association.

It was his task to make sure that those policies were all in line to maintain accreditation. The actual maintenance of the records is Teresa Roberts, the records manager.

Q. When it was time to update portions of the Policy Manual, is that a decision that was made by yourself or by Lieutenant Seevers?

A. Lieutenant Seevers.

Q. Have you had a chance to read the lawsuit in

Page 13

this case?

A. I have not.

Q. Have you developed some understanding about what the Complaint is?

A. Briefly, yes.

Q. Can you tell me what your understanding is of why this lawsuit has been filed?

A. My understanding is that Ms. West feels like we exceeded her consent. Is that accurate?

Q. I think that is accurate, yes.

Are you aware of the allegation that she gave a key to one of the officers? Is that a fact that you are aware of at any point?

A. I have heard -- I am not a direct witness, but I have heard that she provided a key.

Q. All right. Let's go back and talk about this. We are going back to August 11, 2014. I think it was hot that day. I think it might have been the initiation of the armored personnel carrier. You know, I don't know what might jog your memory about the incident.

Do you remember working that day when you first found out that a wanted felon was supposedly in Ms. West's home?

A. I do.

Q. How do you remember first finding out about it?

Page 14

A. I cannot remember who told me. As the Chief, I was always notified when we had a SWAT call-out, you know, that we had this going on. I can't remember -- and this is a guess.

I believe maybe Lieutenant Riley at that time would have told me -- or Lieutenant Seevers. They had a SWAT call-out. From there, I don't know -- you can ask the next question, I guess.

Q. Okay. In this case, did you decide to go to the scene?

A. I did.

Q. Would it be normal for the Chief to go to the scene when there is a SWAT call-out?

A. For me, yes.

Q. So it was your custom to always go when you could?

A. Yes.

Q. Do you remember when you decided to go to the scene?

A. I don't have a time. I arrived well after SWAT had arrived and set up and started their actions.

Q. Let's be a little more precise about their actions because my understanding is that they did containment, they did call-out, and they did some other things. Do you know whether you arrived on scene before

Page 15

they first administered gas?

A. I believe I did. The closest thing I can narrow it down to is -- and, actually, I will retract that. They may have administered gas before I arrived.

The thing that happened that stands out in my mind is that, shortly after I arrived, they removed the dog from the house. That was the first thing that I remember; it was them bringing out the big pit bull.

I couldn't tell you whether there was gas in the house before or after that. I know there was gas after, but I don't know whether there was gas before or not.

Q. Where were you physically on the scene when the pit bull was brought out?

A. The block was cordoned off at both ends, and I was on the east intersection. The house is about mid block. I was on the east side, the side towards the school. There's a school down the road. I would call it the east side, at the intersection.

Q. Okay.

A. When the Animal Control officer arrived and they brought the dog out, it was the same side.

Q. And you said "shortly." Can you give me an approximate amount of time between when you arrived and when they were bringing the dog out?

Page 16

A. Fifteen, twenty minutes.

MR. FISHER: Let's go off the record.

(An off-the-record discussion was held.)

(Exhibit 2 was referenced.)

Q. BY MR. FISHER: I want to talk to you a little bit about Exhibit 2. Chris, I am showing you what has been previously marked as Exhibit 2 in these depositions. It is a series of pages that are marked at the bottom right as CALDWELL 540 and they run through CALDWELL 548.

This has previously been identified to us as a section of the Caldwell Police Department Policy Manual that deals with the subject of SWAT. Does this document look familiar to you?

A. Yes, it does.

Q. I am most interested in going to Section 5, which is on the fourth page; and it talks about "Command and Control Structure."

The third sentence says: "The ranking officer on-scene becomes the incident commander and the SWAT commander, or acting commander when the commander is absent..."

Does that mean that, when you appear on scene, whatever time it was, at that point in time you become the incident commander?

Page 17

A. No. That is kind of a two-headed term. On that scene, for instance, Sergeant Hoadley -- at that time, I believe it was his team that was originally on scene.

This is an assumption by me because I was not there. If they would have set up a perimeter on that house and closed the road, that would have been his team. He, being the supervisor, would have been in control of that.

Q. Okay.

A. With me being on scene, I am obviously the ranking person; but I took no control over that situation. Sergeant Hoadley, or whoever he passed it to, would have continued to maintain that perimeter, have roads closed, whatever action they took.

Q. Well, did you, at any point in time when you arrived on scene, have any discussions with Lieutenant Seevers or Sergeant Winfield about the tactical plan that they created?

A. I did not.

Q. What did you do when you were on scene?

A. I remained in the area, on the east side of the incident. Lieutenant Riley was there with me. Basically, we observed the incident.

Other than observe and -- I didn't take any

Page 18

action, as far as making a decision of how the house was approached or how traffic was routed or anything of that nature.

Q. How long were you on the scene?

A. Until it ended.

Q. Did you have any interaction with Lieutenant Seevers while you were there?

A. None that I remember. The only -- and I don't -- I don't have a recollection of any discussion. At the end of the scene, when it was all done and we were leaving, I walked through the house.

We had some discussion -- I can't remember who with -- about securing the house so that somebody didn't come in the house at night and take property or something like that.

During the actual incident, while they were attacking the house, I don't believe I had any conversations with anybody that I remember.

Q. If SWAT is in control and you are not assuming command, does that mean that Lieutenant Seevers is the final decision-maker?

A. In the tactical operation, yes.

Q. Who would be the final decision-maker in something other than the tactical operation?

A. You would have to narrow that for me, please.

Page 19

Q. Well, maybe I didn't understand how you qualified that. You know, my understanding is SWAT comes on the scene --

A. Yes.

Q. -- and they tell Sergeant Hoadley, "We have got it now." Okay?

A. Uh-huh.

Q. Then Winfield develops a tactical plan and goes through it with Seevers, and then they implement it?

A. Correct.

Q. So my question to you is: Since you never assumed command, does that put Seevers in charge? You seemed to kind of qualify that to just the tactical plan, like there might be something else to be in charge of that Lieutenant Seevers was not the final decision-maker on?

A. The outside perimeter and securing the roadways -- that type of thing is what I am talking about. There would have been another supervisor doing that.

Q. All right. I understand better now.

When you were on the scene, did you talk at all to any of the officers there about what their authority was for going on Ms. West's property?

A. At some point in time, I was informed that we

## Page 32

1 with anybody from the family directly or not.
2    **Q. What is Lieutenant's Wright's job?**
3    A. He's a lieutenant.
4    **Q. At the time, did he have a specific assignment?**
5    A. At that time, he was in charge of the
6 operations division.
7    **Q. That would have put him in a position to**
8 **interact with citizens who had filed tort claims because**
9 **of damaged property?**
10    A. His job was kind of a catch-all at that time.
11 He is not in that position anymore. At that time, it
12 was kind of a catch-all. He took care of a lot of
13 things that were outside of the scope of patrol or
14 investigations.
15    **Q. When you were testifying earlier, I think you**
16 **said that you actually surveyed the damage after the**
17 **house was cleared?**
18    A. Correct.
19    **Q. Tell me what you remember about that.**
20    A. I walked through the house. I entered through
21 the front door. I think I went left first, which would
22 have been through the kitchen and into the garage. If I
23 remember, it's not a very big house. There are a couple
24 of bedrooms. The living room is in front. Do you have
25 a more specific question?

## Page 33

1    **Q. Did it smell of gas?**
2    A. It did.
3    **Q. Did you observe broken entryways, windows, or**
4 **doors?**
5    A. Yes.
6    **Q. Did you observe any damaged personal property?**
7    A. Not that I remember, as far as personal
8 property. I don't remember seeing a lot of personal
9 property in the house. What I did see -- I mean, as you
10 walked in, there was, like, a big television sitting
11 there. I think there was a couch to the right. I
12 didn't see any damage to those items.
13    (Exhibit 10 and Exhibit 11 were referenced.)
14    **Q. BY MR. FISHER: I am going to show you what has**
15 **been previously marked as Exhibit 10 and Exhibit 11 and**
16 **ask you if you recognize what is depicted in that scene.**
17    A. That looks to me like the back door of the
18 residence. You can see the officer standing there in
19 the window. I believe that's, like, the living room
20 area of the house.
21    **Q. Okay.**
22    A. I was talking about the large TV, and I think
23 you can see that through the window and the door.
24    (Exhibit 13 and Exhibit 14 were referenced.)
25    **Q. BY MR. FISHER: I am going to show you now what**

## Page 34

1 has been marked as Exhibit 13 and Exhibit 14. Do you
2 recognize what that depicts?
3    A. I don't remember seeing this when I was in the
4 house. This looks like an attic entryway, but I don't
5 remember personally seeing this when I was in the house.
6 I don't know what room this is in.
7    **Q. Do you remember being informed that one of the**
8 **officers stepped off a rafter and came down through the**
9 **ceiling?**
10    A. I did hear that, yes.
11    (Exhibit 16 was referenced.)
12    **Q. BY MR. FISHER: I am showing you what has been**
13 **marked as Exhibit 16. Do you recognize what that**
14 **depicts?**
15    A. It looks like a bedroom. I don't remember
16 being in this room. This picture doesn't recall
17 anything for me. I mean, it looks like a bedroom; but I
18 don't remember being in this room.
19    (Exhibit 17 was referenced.)
20    **Q. BY MR. FISHER: I am going to show you Exhibit**
21 **17. Does that jog your memory at all about anything you**
22 **saw?**
23    A. Yes. I do remember seeing this baby crib in
24 the room.
25    **Q. Did you know that Ms. West had two children and**

## Page 35

1 was pregnant at the time this happened?
2    A. I did not know how many children she had. I
3 didn't know. I think I -- well, I don't remember
4 whether I knew she was pregnant or not. I knew she had
5 kids, but I didn't know a number.
6    **Q. Would you agree that it probably wouldn't have**
7 **been a habitable place that night for Ms. West and her**
8 **children?**
9    A. I would agree, yes.
10    **Q. You talked a little bit about authorizing a**
11 **hotel. How does that process work?**
12    A. Well, I am really trying to narrow down your
13 question here. There are times when this sort of thing
14 happens. Obviously, in my opinion, you wouldn't have
15 someone go back in here until the gas is removed from
16 it.
17    So as an effort to assist in the situation, we
18 would provide a hotel room. It's not -- this is, by
19 far, not the only time we have done that.
20    **Q. I am sure it is something that happens to other**
21 **law enforcement agencies, as well.**
22    A. Uh-huh.
23    **Q. I am more interested in the process, and I will**
24 **tell you why. I want to ask you some questions about**
25 **how long Ms. West and her family were in a hotel, how**

1  long they were out of their house, and what condition it
2  was in when they came back to it.
3      I don't know if you know anything about that.
4  I am trying to ask you:  When you have a situation like
5  that, who is in charge of making sure that things are
6  made right for the citizen?
7      A.  The final decision in a case, while I was the
8  Chief, would be me.  When something like this happens
9  and we are aware there is damages and things, we have
10  discussions with our insurer.
11      I brought up Lieutenant Wright's name because
12  I believe he was -- again, this is from memory; but I
13  believe he was working with the family to determine how
14  long they would need to be in a hotel.
15      It is my understanding that Ms. West did not
16  own the property.  So there is another party that
17  suffered damages here that had to be dealt with, as
18  well.  I believe Lieutenant Wright was involved in that.
19      So the end responsibility lies with me; but I
20  didn't directly take the action to remediate it, if that
21  makes sense.
22      Q.  If Ms. West was out of her home for two months,
23  should she have been provided a place to live for two
24  months?
25      A.  No.

1      Q.  Why is that?
2      A.  I don't know -- it's a -- we want to assist --
3  this is my -- this would be my own, personal -- this is
4  not a policy.  This is not a police thing.  We want to
5  assist.  We want to do everything we can for the public.
6      Ms. West would have some responsibility to see
7  that her situation was remediated, as well.  It wouldn't
8  be all on the City of Caldwell, if that makes sense.
9      Q.  Well, I guess my question to you is this:  Are
10  you suggesting that the fact that she was out of her
11  home for two months is because she was not getting
12  things done quickly enough?
13      A.  Well, I'm basing this on -- I don't know -- I
14  don't know how fast the homeowner, the property owner,
15  took action.  I don't know how fast -- you know, if
16  there were items to be laundered or repaired, I don't
17  know how fast that -- I don't have any direct knowledge
18  of how fast that happened.
19      So when you say that she was out of the house
20  for two months, I don't know that that was reasonable or
21  not reasonable because I don't know how fast these
22  repairs were made.
23      Q.  Fair enough.  That gives me something else to
24  ask someone else some questions about.
25      A.  Uh-huh.

1      Q.  What would be the procedure for dealing with
2  the personal property that now has gas on it?  You have
3  got Exhibit 17 in front of you.  It has got stuffed
4  animals, a crib, and children's toys; correct?
5      A.  Correct.
6      Q.  What would the police do with all of that
7  stuff?
8      A.  That would be better answered by Lieutenant
9  Seevers or one of the people that handles the gas.
10  There's different types of gas that's remediated
11  differently.  I cannot speak to what they used.
12      Q.  Would it be procedure for them to just pile up
13  her personal property in the garage and leave it in a
14  pile and just be gone?
15      A.  I'm not aware of anybody piling up any stuff.
16  I don't have any knowledge of that.
17      Q.  Well, my question is whether there is a
18  procedure that says, "Hey, just pile this stuff up and
19  leave it"?
20      A.  No.  There's not any procedure of that nature.
21          (Exhibit 12 was referenced.)
22      Q.  BY MR. FISHER:  I am going to show you what has
23  been marked as Exhibit 12.  Have you seen that document?
24  Do you know what that depicts?
25      A.  It's a doorway.  It doesn't ring any -- it's

1  not something I am familiar with.
2      Q.  Does it look damaged to you in any way?
3      A.  No, sir.
4      Q.  Do you know if that is the door that the
5  officers were given a key to?
6      A.  I don't.
7      Q.  I guess I ask the question because, if you
8  compare it to Exhibit 10, it looks like they entered the
9  house in every place except the place they were given
10  the key to.
11      A.  It's possible.
12      Q.  What process did the Caldwell Police Department
13  or the City of Caldwell have in place to compensate
14  citizens for their damaged property in situations like
15  this back when this incident happened?
16      A.  The process would have been to consult with our
17  insurer, and our insurer would assist us in making those
18  decisions.
19      Q.  Do you know what actually happened in this case
20  with regard to Ms. West's efforts to try to get
21  compensated for what she had been through?
22      A.  I know there were discussions.  I don't know
23  what actually happened.  I know there were discussions
24  again with two parties because there's a property owner
25  and Ms. West.

## Page 40

1    I was made aware that the property owner,
2  apparently, was compensated. I don't have any idea what
3  Ms. West's result was. I don't know what offers were
4  made to her. I don't know.
5      Q.  Do you know who would have had that interaction
6  with her?
7      A.  I'm assuming it would be somebody from ICRMP.
8      Q.  Would you be surprised if I told you she was
9  never offered more than $1,000 for what she was put
10  through?
11      MR. LANDON BROWN:  Objection. Foundation.
12      THE WITNESS:  Again, I have no idea what she
13  was offered or who made that offer.
14      Q.  BY MR. FISHER:  In your current position as a
15  City Councilman, have you, at any point in time, had
16  discussions within the City Council regarding this
17  lawsuit?
18      A.  No.
19      Q.  Are the other Council Members aware that this
20  lawsuit is pending?
21      A.  I don't have any idea.
22      Q.  Could the outcome of this lawsuit affect the
23  insurance rates that the City of Caldwell pays to ICRMP?
24      MR. LANDON BROWN:  Objection. Foundation.
25      THE WITNESS:  Again, I don't know. I don't

## Page 41

1  know what our rates are based on.
2      Q.  BY MR. FISHER:  Do you know who makes the
3  decision about how and when to resolve a case like this?
4  Is it done by the Caldwell Police Department, the City
5  Council, your insurer, or all of you together?
6      A.  In most cases, based on my experience working
7  with our insurer, our insurer will make a
8  recommendation. In most cases, I would go with that
9  recommendation. I'm not aware of a case where I didn't
10  go with their recommendation.
11      Q.  Are you talking about when you were the Chief
12  of Police?
13      A.  Yes.
14      Q.  Okay.
15      A.  As far as I am aware of, the Council has never
16  been a deciding vote in that recommendation. The
17  Mayor's Office would certainly be aware of what is
18  happening.
19      As far as the Council, I am not aware of the
20  Council having any input into that. Again, I have only
21  been on the Council for less than a year now. So I'm
22  somewhat new to it.
23      Q.  Right. You have your past experience as the
24  Chief of Police that --
25      A.  As Police Chief, I have not addressed the

## Page 42

1  Council on something like this.
2      Q.  Who is the Police Chief now?
3      A.  Frank Wyant.
4      Q.  If I understood what you said, he would make
5  the decision with the insurer? The Council wouldn't
6  make that decision?
7      A.  Right.
8      MR. FISHER:  I would like to take a brief break
9  here. We will go off the record for about five minutes.
10      (Break taken.)
11      MR. FISHER:  I don't have any further questions
12  for you.
13      MR. LANDON BROWN:  I have no questions.
14    (The foregoing deposition concluded at 12:30 p.m.)
15      (Signature requested.)
16      * * *