# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

SHANIZ WEST, an individual,

    Plaintiff,

    vs.

CITY OF CALDWELL; CITY OF CALDWELL
POLICE DEPARTMENT; FORMER CHIEF
CHRIS ALLGOOD in his official and individual
capacity; SERGEANT DOUG WINFIELD in his
official and individual capacity; LIEUTENANT
ALAN SEEVERS in his official and individual
capacity; OFFICER MATTHEW RICHARDSON
in his official and individual capacity in his official
and individual capacity; and DOES I-X,

    Defendants.

Case No.: 1:16-cv-00359-REB

**MEMORANDUM DECISION AND
ORDER RE:**

**PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(Docket No. 29)**

**DEFENDANTS' CROSS MOTION
FOR SUMMARY JUDGMENT
(Docket No. 33)**

**PLAINTIFF'S MOTION IN LIMINE
TO PROHIBIT BOTH THE DISPLAY
OF FABIAN SALINAS'S
PHOTOGRAPH AND ANY
MENTION OF HIS CRIMINAL
HISTORY AT TRIAL
(Docket No. 24)**

**PLAINTIFF'S MOTION TO STRIKE
THREE FACTS RELYING ON
SHERIFF RANEY'S EXPERT
WITNESS DISCLOSURES IN
SUPPORT OF DEFENDANTS' BRIEF
(Docket No. 35)**

**PLAINTIFF'S MOTION TO STRIKE
FROM DEFENDANTS' STATEMENT
OF FACTS, RESPONSE BRIEF, AND
CROSS MOTION FOR SUMMARY
JUDGMENT REFERENCES TO
INFORMATION POLICE KNEW
BUT DID NOT SHARE WITH
SHANIZ WEST
(Docket No. 36)**

Now pending before the Court are the following motions: (1) Plaintiff's Motion for Summary Judgment (Docket No. 29); (2) Defendants' Cross Motion for Summary Judgment (Docket No. 33); (3) Plaintiff's Motion in Limine to Prohibit Both the Display of Fabian Salinas's Photograph and Any Mention of His Criminal History at Trial (Docket No. 24); (4) Plaintiff's Motion to Strike Three Facts Relying on Sheriff Raney's Expert Witness Disclosures in Support of Defendants' Brief (Docket No. 35); and (5) Plaintiff's Motion to Strike from Defendants' Statement of Facts, Response Brief, and Cross Motion for Summary Judgment References to Information Police Knew but Did Not Share with Shaniz West (Docket No. 36). Having carefully considered the record, participated in oral argument, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I.    GENERAL BACKGROUND

This action relates to an August 11, 2014 standoff between Fabian Salinas and police officers from the Caldwell Police Department at Plaintiff Shaniz West's residence in Nampa, Idaho. Plaintiff generally alleges that, in attempting to apprehend Mr. Salinas, Defendants violated her Fourth Amendment rights by effectively destroying her home. The pertinent factual backdrop is as follows:

1. At all relevant times to this action, Plaintiff rented a house located at 10674 Gossamer Street in Nampa, Idaho (the "Residence"); Plaintiff lived at the Residence with her two adolescent children (while also pregnant with her third child). *See* Am. Compl., ¶ 15 (Docket No. 20).

2. During the night and early morning hours of August 10-11, 2014, Plaintiff heard knocking on the doors and windows of the Residence. *See* Defs.' SOF, No. 7 (Docket No. 33, Att. 2). On the morning of August 11, 2014, Plaintiff called the police to report the incident and Officer Troyer with the Caldwell Police Department responded. *See id.* Plaintiff told Officer

**MEMORANDUM DECISION AND ORDER - 2**

Troyer that the knocking may have been her ex-boyfriend, Mr. Salinas. *See id.* Likewise, Mr. Salinas's sister, Crystal Vasquez (who was also at the Residence during this time), suggested that the knocking might have been Mr. Salinas. *See id.* Officer Troyer told Plaintiff that Mr. Salinas had warrants for his arrest and that the police would patrol the area looking for him. *See id.*

3. Later that day, Mr. Salinas came to the Residence to retrieve some of his belongings. *See* Am. Compl., ¶ 16 (Docket No. 20). Mr. Salinas was a wanted felon. *See id.* at ¶ 17; *see also* Defs.' SOF, Nos. 1-5 (Docket No. 33, Att. 2) (discussing Mr. Salinas's gang affiliation and criminal history, including, but not limited to, rioting, discharging a weapon, aggravated assault, and drug charges).

4. When Mr. Salinas arrived at the Residence, Plaintiff was preparing to leave to register her son for elementary school. *See* Am. Compl., ¶ 18 (Docket No. 20). Plaintiff instructed Mr. Salinas to gather his belongings (which were in boxes in the garage) and vacate the Residence before she returned. *See id.* Before leaving, Plaintiff told Mr. Salinas to lock the chain lock on the front door and leave the back door unlocked. *See* Defs.' SOF, No. 8 (Docket No. 33, Att. 2); *see also* Pl.'s Stmt. of Add'l Facts, No. 1 (Docket No. 34, Att. 1). Plaintiff then left the Residence with her two children and began walking toward her son's school. *See* Am. Compl., ¶ 18 (Docket No. 20).

5. Police officers then responded to a 911 call from Plaintiff's grandmother, Deborah Garcia, requesting assistance at the Residence. *See* Defs.' SOF, No. 9 (Docket No. 33, Att. 2) (after leaving Residence, Ms. Vasquez informed Ms. Garcia that Mr. Salinas was at Residence, prompting Ms. Garcia to call 911 and report that Mr. Salinas was there, with recorded dispatch call log indicating that Ms. Garcia "provided police with the following information: (1) Salinas was at West's home and was possibly threatening her with a BB gun; (2) there were children at the house; (3) Salinas was inside the home even if West informed officers that he was

not at the house; (4) Salinas was in possession of a BB gun; and (5) Salinas was on meth.")
(internal citations omitted).

6.     The Caldwell Police Department responded and, after arriving at the Residence,
Detective Matthew Richardson attempted to call Plaintiff's cell phone multiple times, but did not
receive an answer. *See id*. at No. 11.  He then called Ms. Garcia to gather more information,
learning that (1) Ms. Garcia believed Mr. Salinas was inside the Residence; (2) he likely parked
his car somewhere else; (3) he had a loaded BB gun; (4) he was "starting shit with Shaniz"; (5)
he probably broke Plaintiff's phone; and (6) Ms. Vasquez was at the Residence but she left once
Mr. Salinas arrived. *See id*.  Detective Richardson then tried to call Ms. Vasquez but the call
went to her voicemail. *See id*.  He then knocked on the Residence's door and called out for Mr.
Salinas and Plaintiff, but did not receive an answer. *See id*.

7.     Detective Richardson then called a different number for Ms. Vasquez; this time,
she answered the phone. *See id*. at No. 12.  Ms. Vasquez told Detective Richardson that (1) she
saw Mr. Salinas inside the Residence 20-30 minutes prior; (2) he was in possession of a firearm
that she believed was a BB gun; (3) he was waiving the BB gun around; (4) he was on drugs; (5)
somebody had dropped him off at the Residence and left; and (5) Plaintiff was not answering her
phone. *See id*.  After this call, the police officers on the scene discussed whether they should
enter the Residence. *See id*.  Officer Hemmert stated that he heard a noise in the garage that
sounded like somebody opening a crawl space. *See id*.  Around this time, Sergeant Hoadley saw
Plaintiff walking down the sidewalk toward the Residence. *See id*.

8.     Earlier, as she was walking to register he son at the school, Plaintiff received a
phone call from police dispatch. *See id*. at No. 13.  She answered the phone, but it immediately
died. *See id*.  Plaintiff did not know why dispatch was calling her, but she believed the call was
either to follow up from her morning call to police, or because police officers who were

patrolling the area, saw Mr. Salinas enter the Residence. *See id.* When she returned at approximately 2:20 p.m., Plaintiff found numerous Caldwell Police Department officers outside the Residence, assuming that their presence had something to do with Mr. Salinas. *See id.*, *see also* Am. Compl., ¶ 19 (Docket No. 20); Pl.'s Stmt. of Add'l Facts, Nos. 4-5 (Docket No. 34, Att. 1) ("When West returned, she found her home 'surrounded with officers.' Five police officers, to be exact: Officers Joey Hoadley ("Hoadley"), Arguello, Hemmert, Schreiber, and Detective Matt Richardson ("Richardson").") (internal citations omitted). Even so, Plaintiff did not understand why police officers were in the backyard of the Residence. *See* Pl.'s Stmt. of Add'l Facts, No. 6 (Docket No. 34, Att. 1); *see also id.* at No. 7 ("One officer was guarding the front door and garage door, Officer Hemmert was in the backyard, having gained entry through an open gate, Hoadley was on the east side of the home, watching both the front and back and two other officers generally roving around the home.").

9.      Upon seeing Plaintiff walking toward the Residence, Sergeant Hoadley and Detective Richardson approached and later spoke with her. *See* Defs.' SOF, No. 14 (Docket No. 33, Att. 2); *see also* Pl.'s Stmt. of Add'l Facts, No. 9 (Docket No. 34, Att. 1). Plaintiff explained that Mr. Salinas had been there earlier to retrieve his belongings, that she told him to leave, and that she was unsure whether he was still inside the Residence. *See* Am. Compl., ¶¶ 20-24 (Docket No. 20); *see also* Pl.'s SOF, Nos. 4-5 (Docket No. 29, Att. 2); *see also* Pl.'s Stmt. of Add'l Facts, No. 10 (Docket No. 34, Att. 1). Believing that Plaintiff may not be telling him the truth about Mr. Salinas's location, Detective Richardson informed her that if Mr. Salinas was inside her home and she did not tell officers that fact, she could get in trouble for harboring a felon. *See* Defs.' SOF, No. 14 (Docket No. 33, Att. 2); *see also* Pl.'s SOF, No. 6 (Docket No. 6); Pl.'s Stmt. of Add'l Facts, No. 13-16 (Docket No. 34, Att. 1). Feeling threatened, Plaintiff then informed Detective Richardson that Mr. Salinas was inside the Residence, that he had a firearm

that she believed was a BB gun, and that he had locked the chain lock on the front door. *See* Pl.'s SOF, No. 7 (Docket No. 29, Att. 2); *see also* Pl.'s Stmt. of Add'l Facts, No. 17-18 (Docket No. 34, Att. 1); Defs.' SOF, No. 14 (Docket No. 33, Att. 2); *but see* Defs.' Stmt. of Disp. Facts, No. 2 (Docket no. 33, Att. 2) (disputing that Plaintiff felt threatened "solely because of Richardson's questions," commenting: "Thus, when Richardson informed her of the law of harboring a felon, several other factors (such as her own actions of letting Salinas into her home without informing police, when she knew he had arrest warrants) weighed into any feelings she may have had."). A portion of the audio recording of the conversation reflects the following:

| | |
|---|---|
| Richardson: | Is he in there? |
| Plaintiff: | [Inaudible] |
| Richardson: | Okay. Do you have a key to the front door? |
| Plaintiff: | He has the top lock locked. |
| Richardson: | 21-201. Shaniz is advising he's inside. . . . . |
| Richardson: | So how certain are you that he's in there? |
| Plaintiff: | [Inaudible] . . . and I have a pit bull. She's very friendly. |
| Richardson: | Okay. I heard the dog. So you think for certain he's in there? |
| Plaintiff: | [Inaudible] |
| Richardson: | Okay. She's 100 percent positive he's in there. |

Defs.' Stmt. of Disp. Facts, No. 2 (Docket No. 33, Att. 2).

10.    After additional questioning – specifically, Detective Richardson asking: "Shaniz, let me ask you this: Do we have permission to get inside your house and apprehend him?" – Plaintiff ultimately gave Detective Richardson a key to the Residence and gave him consent to use the key to enter the Residence and arrest Mr. Salinas. *See* Am. Compl., ¶ 24 (Docket No. 20); *see also* Pl.'s SOF, Nos. 8-9 (Docket No. 29, Att. 2); Defs.' SOF, No. 17 (Docket No. 33, Att. 2); Pl.'s Stmt. of Add'l Facts, No. 19 (Docket No. 34, Att. 1).[1]  Though

---

[1] It is unclear whether the key that Plaintiff provided to Detective Richardson only unlocked the front door of the Residence, or both the front and back door of the Residence. *Compare* Pl.'s SOF, No. 9 (Docket No. 29, Att. 2) ("West expresses consent and, responding to a specific request, gives Officer Richardson the key *that unlocks both the front and back doors to her home*.") (emphasis added), *with* Defs.' SOF, No. 17 (Docket No. 33, Att. 2) ("West further

originally instructed to stay close by, Plaintiff was later allowed to leave, and actually left the premises, providing no additional consent beyond that identified above. *See* Am. Compl., ¶ 25 (Docket No. 20); *see also* Pl.'s SOF, Nos. 10-12 (Docket No. 29, Att. 2); Defs.' SOF, No. 18 (Docket No. 33, Att. 2) ("Richardson wanted West to stay nearby so 'she could revoke consent at any time.'") (internal citations omitted); Pl.'s Stmt. of Add'l Facts, Nos. 34-35 (Docket No. 34, Att. 1).

11.    Sergeant Hoadley then called the Canyon County Prosecuting Attorney's Office and spoke with the on-call prosecutor. *See* Defs.' SOF, No. 19 (Docket No. 33, Att. 2). Sergeant Hoadley informed the prosecutor of the "facts" and informed the prosecutor that officers were entering the Residence to arrest a person with a felony arrest warrant rather than conducting a search for drugs or illegal items. *See id*. The prosecutor informed Sergeant Hoadley that a search warrant was not needed if consent was obtained. *See id*.

12.    Sergeant Hoadley then contacted SWAT Commander Alan Seevers and requested SWAT's assistance. *See id*. at No. 20; *see also* Pl.'s Stmt. of Add'l Facts, No. 21 (Docket No. 21 (Docket No. 34, Att. 1) ("Hoadley initially considered making entry into the home using the keys[2] provided by Ms. West; determined it was too dangerous, and then left the keys in the door and elected, instead, to call SWAT.").

13.    According to Plaintiff, "Caldwell Police [did] not inform [her] they [were] contacting SWAT or that any "tactical plan" involving the potential destruction of the Residence

understood that her front door was locked by a chain, and that the key she provided to the officers would not unlock the chain lock on her front door.").

[2] It is unclear whether Plaintiff provided Detective Richardson a single key or multiple keys to the Residence. This distinction is immaterial for the purposes of this Memorandum Decision and Order, except insofar as informing the Caldwell Police Department's and/or SWAT's ability to access the Residence through either the front or back door.

was under consideration or could possibly be employed. *See* Pl.'s SOF, No. 14 (Docket No. 29, Att. 2); *see also* Pl.'s Stmt. of Add'l Facts, No. 22, 24-26, 30-34 (Docket No. 34, Att. 1) ("Hoadley did not advise Ms. West that he was going to use a methodology other than the keys to enter West's home. . . . . Richardson did not tell West that they were contacting SWAT. He is unsure whether anyone else did. Hoadley does not recall any discussion with West about calling SWAT to the scene. Ms. West does not remember any of the officers commenting that they were going to call SWAT. . . . . Seevers did not speak with anyone that evening regarding West's concerns[3] about her house being destroyed and whether she'd be able to return home with her children. No one had any discussions with West about the fact that gas canisters would be shot into her home, through windows, and doors. West did not give CPD permission to deploy a canister of tear gas through her back door. West did not give CPD permission to deploy tear gas through any other windows.") (internal citations omitted).

14. At approximately 3:00 p.m., Commander Seevers notified SWAT Team Leader Doug Winfield that SWAT was being activated "to respond to a barricaded subject inside a residence." Defs.' SOF, No. 21 (Docket No. 33, Att. 2). Thereafter, members of the SWAT Team met at the Caldwell Police Department, put their tactical gear on, created a tactical plan, and were briefed on the tactical plan's details. *See id.* The tactical plan (developed by Team Leader Winfield) was designed to extract Mr. Salinas from the Residence without requiring SWAT members to go inside. *See id.* The first step was to contain the Residence and call out Mr. Salinas. *See id.* If Mr. Salinas did not come out, the second step was to introduce tear gas into the Residence to try and force him out. *See id.* If the tear gas did not remove Mr. Salinas

---

[3] It is unclear whether Plaintiff is implying here that she previously relayed concerns about her house being damaged as a result of any efforts to apprehend Mr. Salinas. If she is attempting to relay that she, in fact, made such concerns known, she fails to direct the Court's attention to evidence in the record substantiating as much.

from the Residence, the third step was to conduct a "limited breach of the home," with the front

door as the primary point of entry, and the back door as the secondary point of entry in the event

the front door was barricaded.  *See id*; *see also* Pl.'s SOF, No. 15 (Docket No. 29, Att. 2)

(initially stating that "SWAT gave no consideration to the fact that West had given officers the

key to her home," but going on to acknowledge nonetheless that "[u]sing the key to enter the

home and apprehend Salinas is later described as a 'possibility' but a 'last resort.'") (internal

citations omitted); Pl.'s Stmt. of Add'l Facts, No. 28-29 (Docket No. 34, Att. 1); *but see* Defs.'

Stmt. of Disp. Facts, No. 3 (Docket No. 33, Att. 2) ("If the officers needed to breach the home,

the third step of the tactical plan required police officers to enter the home through the front door

using the key.  In executing the plan, police officers used the key to unlock the front door, but the

door was locked with a chain.") (internal citations omitted).  Commander Seevers approved the

tactical plan and the SWAT Team "conducted dry runs at the police station to practice the plan."

Defs.' SOF, No. 21 (Docket No. 33, Att. 2).

15.     The SWAT Team (consisting of 18 officers) arrived at the Residence at

approximately 5:23 p.m., parking an armored vehicle in front of the Residence.  *See id*. at No.

25; *see also* Am. Compl., ¶ 28 (Docket No. 20).  Plaintiff was not there at this time.  *See* Pl.'s

Stmt. of Add'l Facts, No. 36 (Docket No. 34, Att. 1).  The SWAT Team made PA

announcements requesting Salinas to come out of the Residence.  *See* Defs. SOF, No. 25 (Docket

No. 33, Att. 2).  Mr. Salinas did not come out.  *See id*.

16.     At 5:42 p.m., the SWAT Team deployed tear gas into the Residence, using a 12-

gauge shotgun to shoot tear gas canisters through windows and, in one instance, the garage door

since the garage had no windows to shoot through.  *See id*.; *see also* Pl.'s SOF, Nos. 17-18

(Docket No. 29, Att. 2).  The SWAT Team waited approximately one-and-one-half hours for the

tear gas to spread throughout the Residence, continuing to call out Mr. Salinas in the meantime. *See id.* Again, Mr. Salinas did not come out. *See* Defs.' SOF, No. 25 (Docket No. 33, Att. 2).[4]

17.     At 7:12 p.m., the SWAT Team attempted to enter the Residence, using the key to unlock the front door and the deadbolt, however the front door was chained shut. *See id.* The entry team then moved to the secondary entry point (the back door) – the glass in the back door was already removed from deploying the tear gas, so the entry team was able to make entry by reaching an arm through the broken glass and unlocking the back door. *See id.*; *see also* Pl.'s SOF, No. 20 (Docket No. 29, Att. 2). After entering the Residence, the entry team "held" and called out for Mr. Salinas, but received no response. Defs.' SOF, No. 25 (Docket No. 33, Att. 2). The entry team continued to move into the Residence, hold, and then call out for Mr. Salinas. *See id.*

18.     Eventually, the entry team searched the entire Residence but Salinas was not located; indeed, he had apparently left the Residence earlier that day. *See id.*

19.     When Plaintiff was allowed to return and re-enter the Residence, she found it destroyed – according to Plaintiff, her and her children's personal belongings were saturated with tear gas, debris from the walls and ceilings littered the home, and broken window glass was everywhere. *See* Am. Compl., ¶¶ 30-31 (Docket No. 20); *see also id.* at ¶ 29 ("During the course of the standoff, Caldwell Police shot canisters of tear gas into the home, riddling the walls and ceilings with holes, broke numerous windows, and crashed through ceilings."); Pl.'s SOF, No. 21 (Docket No. 29, Att. 2) ("The SWAT Team shoots tear gas into every living space in the home, coating the home and its contents – food, bedding, furniture, clothing appliances, electronics, etc.

---

[4] Plaintiff states that the SWAT Team fired a "second round of tear gas" into the Residence, but this is not confirmed by Defendants' briefing. *See* SOF, No. 19 (Docket No. 29, Att. 2). Any uncertainty in this respect is immaterial for the purposes of this Memorandum Decision and Order.

– with broken glass and a golden sticky residue that causes tearing, burning and discomfort upon contact.") (internal citations omitted); Pl.'s Stmt. of Add'l Facts, Nos. 43-46 (Docket No. 34, Att. 1) (describing Chief of Police, Chris Allgood's visit to Residence following standoff and his acknowledgment of damage to same).

20.    Two months later, Plaintiff and her children were able to re-occupy the Residence.  *See* Am. Compl., ¶ 32 (Docket No. 20); *see also* Pl.'s SOF, No. 22 (Docket No. 29, Att. 2).  The City of Caldwell put Plaintiff and her children in a hotel for three weeks and paid Plaintiff $900.00 for damage to her personal property (Plaintiff did not own the Residence).  *See* Defs.' SOF, p. 12, n.2 (Docket No. 33, Att. 2).

21.    Through this action, Plaintiff brings three claims against Defendants the City of Caldwell and the Caldwell Police Department (collectively the "Caldwell City Defendants"), as well as Chris Allgood (the Chief of the Caldwell Police Department on August 11, 2014), Doug Winfield (the Caldwell Police SWAT Team Leader on August 11, 2014), Alan Seevers (the SWAT Team Commander on August 11, 2014), Officer Matthew Richardson (a responding officer/detective at the Residence on August 11, 2014), and unnamed officers from the Caldwell Police Department involved in the August 11, 2014 stand-off:  (1) Unreasonable Search (against all Defendants); (2) Unreasonable Seizure (against all Defendants); and (3) Conversion (against only the non-Caldwell City Defendants).  *See id*. at ¶¶ 6-14, 33-57.

22.    On April 10, 2017, Plaintiff moved for summary judgment.  *See* Pl.'s MSJ (Docket No. 29).  Defendants opposed Plaintiff's summary judgment efforts on May 1, 2017, while also affirmatively moving for summary judgment on their own.  *See* Opp. to Pl.'s MSJ & Cross MSJ (Docket No. 33).  These Cross Motions for Summary Judgment, alongside three related motions filed by Plaintiff (Docket Nos. 24, 35-36), are now the subject of this Memorandum Decision and Order.

**MEMORANDUM DECISION AND ORDER - 11**

## II. **DISCUSSION**

**A.     Cross Motions for Summary Judgment (Docket Nos. 29 & 33)**

    1.     Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides, in pertinent part, that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  For summary judgment purposes, an issue must be both "material" and "genuine."  An issue is "material" if it affects the outcome of the litigation; an issue is "genuine" if it must be established by "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *Hahn v. Sargent*, 523 F.3d 461, 464 (1st Cir. 1975) (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)); *see also British Motor. Car Distrib. v. San Francisco Auto. Indus. Welfare Fund*, 883 F.2d 371, 374 (9th Cir. 1989).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When parties submit cross motions for summary judgment, courts independently search the record for factual disputes.  *See Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).  The filing of cross motions for summary judgment "where both parties essentially assert that there are no material factual disputes" does not vitiate a court's responsibility to determine whether disputes as to material facts are present.  *See id.*

In considering a motion for summary judgment, courts do not make findings of fact or determine the credibility of witnesses.  *See Anderson*, 477 U.S. at 255.  Rather, it must draw all

inferences and view all evidence in the light most favorable to the nonmoving party.  *See*

*Matsushita*, 475 U.S. at 587-88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008).

       2.    <u>Plaintiff's Motion for Summary Judgment (Docket No. 29)</u>

The Fourth Amendment guarantees "[t]he right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const.

amend. IV.[5]  As a general matter, a warrant is necessary for an involuntary search to be

presumptively reasonable under the Fourth Amendment, but it is also well-established that a

search is presumptively reasonable if a citizen voluntarily consents to the search.  *See Vernonia*

*School Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995); *Florida v. Jimeno*, 500 U.S. 248, 250-51

(1991).  Where consent has been given, disputes regarding the constitutionality of a search often

focus on the scope of that consent.

To discern the scope, courts apply a standard of "objective reasonableness":  "what

would the typical reasonable person have understood by the exchange between the officer and

the suspect?"  *Jimeno*, 500 U.S. at 251.  Thus, even where there has been general consent to

search, the extent of an officer's search within an area "is not limitless" and always depends on

the objective reasonableness of searching the particular item involved.  *See, e.g.*, *id*. at 251-52

(holding that consent to search car included consent to open and search paper bag hidden beneath

seat, but noting that "[i]t is very likely unreasonable to think that a suspect, by consenting to the

---

    [5] Under a Fourth Amendment analysis, a "search" occurs when the government physically occupies private property for the purpose of obtaining information.  *See U.S. v. Jones*, 565 U.S. 404-05 (2012) ("It is important to be clear about what occurred in this case:  The Government physically occupied private property for the purpose of obtaining information.  We have no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted.").  Relatedly, a "seizure" of property occurs when "'there is some meaningful interference with an individual's possessory interest in that property.'"  *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 61 (1992) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).  Neither party disputes the existence of a search and seizure in this instance and, hence, the Fourth Amendment's related application.

search of his trunk, has agreed to the breaking open of a locked briefcase within the trunk").
Accordingly, courts have held that, while a consent to search a space includes consent to search
unlocked containers within that space, the consent does *not* extend to damaging property found
within. *Compare, e.g.*, *United States v. Strickland*, 902 F.2d 937, 942 (11th Cir. 1990) (holding
that consent to search vehicle did not include consent to slash spare tire and look inside), *with*
*United States v. Jackson*, 381 F.3d 984, 988-89 (10th Cir. 2004) (holding that consent to search
bag included consent to search baby powder container where no damage was inflicted to
container itself).

It is against this general backdrop that Plaintiff moves for summary judgment, arguing in
no uncertain terms that, "as a matter of law, police officers violate the Fourth Amendment rights
of an innocent third party who consents to the search of her home when officers conducting the
search make the home unlivable by shooting canisters of tear gas through the windows, the
garage door, and into the walls and ceilings, saturating the home and its contents with noxious
chemicals." Mem. in Supp. of Pl.'s MSJ, p. 2 (Docket No. 29, Att. 1); *see also generally id*. at
pp. 3-9 (citing *Strickland*, 902 F.2d at 942; *United States v. Ibarra*, 965 F.2d 1354, 1358 (5th Cir.
1992); *United States v. Osage*, 235 F.3d 518, 521 (10th Cir. 2000); *State v. Garcia*, 986 P.2d 491,
494 (N.M. Ct. App. 1999); *U.S. v. Navas*, 640 F. Supp. 2d 256, 267 (S.D.N.Y. 2009)).[6]
Essentially, Plaintiff argues that, by effectively destroying the Residence, Defendants exceeded
the scope of her general consent to allow police officers to enter the Residence to arrest Mr.
Salinas, because "**[n]o reasonable person impliedly consents to the destruction of her home**

---

[6] For the purpose of *Plaintiff's* Motion for Summary Judgment, Plaintiff assumes the position that, in speaking with Detective Richardson, the consent to search her home was validly obtained. *See* Mem. in Supp. of Pl.'s MSJ, p. 2, n.1 (Docket No. 29, Att. 1). However, in opposing *Defendants'* Cross Motion for Summary Judgment, Plaintiff argues that issues of material fact surround the question of whether that consent was truly voluntary. *See* Opp. to Defs.' Cross MSJ, p. 3, n.1 & pp. 8-10 (Docket No. 34).

**and its contents.**" Reply in Supp. of MSJ, p. 4 (Docket No. 34) (emphasis in original); *see also id.* at p. 2 ("Because no reasonable person believes that cooperating with the police impliedly means that the police can destroy her home and its contents, this Court can and should hold, as a matter of law, that the Defendants' intentional destruction of Ms. West's home and its contents exceeded the scope of Ms. West's consent and was, therefore, unreasonable."). Plaintiff's argument – while logical in the abstract – misses the point.

When a party consents to a search, that consent grants permission to perform a search without a warrant, while establishing the physical footprint – or scope – for that search. *See Jimeno*, 500 U.S. at 251 ("The scope of a search is generally defined by its expressed object.") (citing *United States v. Ross*, 456 U.S. 798 (1982)). However, it goes too far to say (as Plaintiff attempts to do here) that a consent *also* dictates how that search is to be performed (independent of whatever limitations might exist by way of what is/is not actually to be searched). Simply put, a consent to a search speaks to the "what" is to be searched; it does not speak to the "how" a search is to take place. *See United States v. Rubio*, 727 F.2d 786, 796 (9th Cir. 1983) (scope of search refers to physical bounds of area to be searched, not manner of search or tactics used).

It is true that case law exists which blurs this nuanced point and, thus, could be read to support Plaintiff's summary judgment efforts. *See e.g.*, *United States v. Martinez*, 949 F.2d 1117, 1119 (11th Cir. 1992) ("[G]eneral permission to search does not include permission to inflict intentional damage to the places or things to be searched."); *see also* Mem. in Supp. of Pl.'s MSJ, pp. 3-5 (Docket No. 29, Att. 1) (Plaintiff citing *Strickland*, *Ibarra*, *Osage*, *Garcia*, and *Navas*). However, such cases address the permitted scope of a challenged search in the context of the consent given – that is, what could legally be searched when considering the consent given? In answering that question, cases take into account whether the things searched were damaged, destroyed, or otherwise rendered useless. *See Strickland*, 902 F.2d 937 (slashing spare

tire in automobile); *Ibarra*, 965 F.2d 1354 (using sledge hammer to knock out secured boards of

closet ceiling/attic floor of residence); *Osage*, 235 F.3d 518 (opening sealed can inside suitcase

with multi-tool); *Garcia*, 986 P.2d 491 (drilling hole in welded shut compartment of vehicle);

*Navas*, 640 F. Supp. 2d 256 (drilling, peeling, and ripping apart trailer's roof inside warehouse).

In other words, in determining what a consenter actually consented to have searched, cases tend

to focus on whether what was searched was damaged, and if so, generally concluding that,

because a reasonable consenter would not have consented to have their property destroyed, they

necessarily did not consent to have that damaged property searched in the first instance.

But that is not this situation. Here, there is no dispute about what Plaintiff consented to

be searched – the Residence. *See* Reply in Supp. of Pl.'s MSJ, p. 3 (Docket No. 34) ("Ms. West

allowed the officers to search her home. She gave them the keys to do so. She did not restrict

them from searching in the attic, in the closets, behind the couches, under the bed. While she

may have been afraid of the threats that she would go to jail if Salinas was in the home and she

did not tell them, she had nothing to hide."). There is also no allegation that either the police

officers or the SWAT Team present at the Residence on August 11, 2014 searched anything

other than the consented-to Residence. Stated differently, plaintiff does not take issue with *what*

was searched/seized (like the plaintiffs in the cases she cites), but rather *how* the search was

performed. Therefore, the fact that Plaintiff's property was destroyed at the Residence during

the search does not mean *ipso facto* that the search violated the Fourth Amendment on a "scope

of consent" theory. To hold otherwise, and adopt Plaintiff's argument that *any* damage incurred

during a consent search somehow dissolves the underlying consent and renders the now-

warrantless search a *per se* Fourth Amendment violation, would create a categorical rule that has

no precedential support. The facts of this case cannot be shoehorned into the circumstances at

play in the cases Plaintiff cites – they do not neatly apply.

**MEMORANDUM DECISION AND ORDER - 16**

But Plaintiff's claims are not altogether hollowed out by the above-referenced analysis. While the at-issue search is not *per se* unreasonable owing to her consent, a Fourth Amendment violation still exists if the search itself is unreasonable. *See Hagar v. Rodbell*, 2012 WL 827068, *3 (D. Ariz. 2012) ("An otherwise lawful search and seizure can violate the Fourth Amendment if it is executed in an unreasonable manner.") (citing *Jacobsen*, 466 U.S. 109, 124 (1984)); *see also Franklin v. Foxworth*, 31 F.3d 873, 875 (9th Cir. 1994) ("The Fourth Amendment proscribes only 'unreasonable' searches and seizures. However, the reasonableness of a search or a seizure depends 'not only on when it is made, but also on how it is carried out.' In other words, even when supported by probable cause, a search or seizure may be invalid if carried out in an unreasonable fashion. . . . Whether an otherwise valid search or seizure was carried out in an unreasonable manner is determined under an objective test, on the basis of the facts and circumstances confronting the officers.") (quoting *Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985)).[7]

To determine whether a search is reasonable within the meaning of the Fourth Amendment, courts examine the search based on the "totality of the circumstances." *Samson v.*

[7] In *Franklin*, police officers executed a valid search warrant at a residence where a suspected gang member engaging in drug activity might be present at the home of his mother and the plaintiff. *See Franklin*, 31 F.3d at 874. The plaintiff suffered from advanced multiple sclerosis, rendering him bedridden, unable to feed himself or sit up without assistance, and unable to control his bowels; as a result, he wore only a t-shirt in bed. *See id*. After entering the plaintiff's bedroom with guns drawn and searching the room, officers handcuffed his hands behind his back, carried him to the living room, and placed him on a couch with his genitals exposed. *See id*. at 875. After complaining that the handcuffs were causing him pain and that he was cold and tired from sitting upright, the officers re-handcuffed his hands in front of his body and gave him a blanket. *See id*. The plaintiff was then forced to sit on the couch for over two hours until the search of the house was complete. *See id*. The Ninth Circuit held that, notwithstanding a valid search warrant, the detention was unreasonable. *Id*. at 876-78 ("It is clear, in light of the district court's findings of fact, that the officers *executing the search warrant at the Curry-Franklin home acted unreasonably. They executed the warrant in an unreasonable manner*, first by removing a gravely ill and semi-naked man from his sickbed without providing any clothing or covering, and then by forcing him to remain sitting handcuffed in his living room for two hours rather than returning him to his bed within a reasonable time after the search of his room was completed.") (emphasis added).

*California*, 547 U.S. 843, 848 (2006). "Whether a search is reasonable is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.*; *see also Hagar*, 2012 WL 827068 at *3 ("'To assess the reasonableness of th[e] conduct, [a court] must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'") (quoting *Jacobsen*, 466 U.S. at 125 (internal quotation marks omitted)).

In *Hagar*, a warrant was issued to search the plaintiff's residence. *See Hagar*, 2012 WL 827068 at *1. Because the residence was believed to contain dangerous guns, the Scottsdale Police Department SWAT Team was tasked with serving the search warrant. *See id.* While approaching the door, the SWAT Team dismantled at least one security camera and used a ram to breach the door and enter the residence. *See id.* While the SWAT Team was securing the residence, several light/sound diversionary devices ("flash bangs") were used including one device that was deployed inside of the plaintiff's residence. *See id.* After the home was secured, the SWAT Team left, while other personnel executed the search. *See id.* The interior of the home, the garage, and the attic were searched. *See id.* The plaintiff's vehicle was impounded and a warrant was issued to search the vehicle. *See id.* After a criminal conviction, the plaintiff filed a civil suit against the defendants, alleging a Fourth Amendment violation, arising from an unreasonable search and seizure of his residence. *See id.* at *1 & 3. Specifically, the plaintiff alleged that five security cameras were ruined, the front door and the door frame were damaged, a two foot square portion of the living room carpet was burned, ceilings in multiple rooms were cracked, and his pet dogs were terrorized during the search of his residence. *See id.* at *3. In denying the defendants' motion for summary judgment, the United States District Court for the District of Arizona reasoned:

Plaintiff has presented evidence that supports his allegations of damage to his residence during the December 17 search. *See, e.g., San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962 (9th Cir. 2005) (upholding the district court's denial of summary judgment when damage to the plaintiff's property included, *inter alia*, cutting off mailbox, breaking refrigerator door, and removal of a concrete slab); *Youngbey v. District of Columbia*, 766 F. Supp. 2d 197, 220 (D.D.C. 2011) (holding that the use of flash bang grenades in a residence of a homicide suspect who might have a gun did not warrant dismissal at the summary judgment stage). It is not clear that the alleged damage rises to the level of a constitutional violation because officers executing a search warrant occasionally "must damage property in order to perform their duty." *Dalia v. United States*, 441 U.S. 238, 258 (1979). Whether the damage alleged by Plaintiff is unreasonable, however, is a question of fact best left for the jury to decide with the benefit of the full record. *See Chew v. Gates*, 27 F.3d 1432, 1443 (9th Cir. 1994) (reasonableness under the Fourth Amendment is ordinarily a fact question for the jury). Thus, the Court denies Defendants' motion for summary judgment with respect to this Fourth Amendment violation.

*Id*.

Similar to *Hagar*, issues of fact populate the issue of whether the August 11, 2014 search and/or seizure at the Residence was reasonable, as executed. Defendants make an impressive effort at arguing that the manner in which the search was conducted was reasonable and not unnecessarily destructive. *See* Mem. in Supp. of Cross MSJ, pp. 22-27 (Docket No. 33, Att. 1). Even so, the fact remains that, following the search/seizure, the Residence was rendered uninhabitable. Whether the actions contributing to this reality were objectively reasonable in light of the circumstances confronting the involved officers that day is a disputed question of fact, incapable of resolution as a matter of law at this procedural stage of the litigation.[8] For these reasons, Plaintiff's Motion for Summary Judgment is denied.

---

[8] As part of the briefing on the parties' Cross Motions for Summary Judgment, Plaintiff contends that [t]he reasonableness of the tactical plan is not at issue in this lawsuit" and that, as such, its execution was not "unnecessarily destructive." Reply in Supp. of Pl.'s MSJ, pp. 11-12 (Docket No. 34). At first blush, this acknowledgment would seem to doom Plaintiff's claims in light of the Court's consideration of her Motion for Summary Judgment here. This tension is slackened, however, when understanding that Plaintiff's argument that the police exceeded the scope of her cooperation – while perhaps misplaced in the context of her arguments as a matter of law – nonetheless challenges the reasonableness of their contemporaneous search.

3.      Defendants' Cross Motion for Summary Judgment (Docket No. 33)

Defendants also move for summary judgment, arguing that (1) Plaintiff failed to allege a

proper constitutional violation; (2) the individual Defendants are entitled to qualified immunity;

and (3) Plaintiff failed to allege a proper *Monell* claim against the City of Caldwell.  *See* Mem. in

Supp. of Cross MSJ, p. 14 (Docket No. 33, Att. 1).[9]  Each argument is considered below.

a.      *Constitutional Violation*

Defendants argue that Plaintiff's Fourth Amendment claims must fail because she has

failed to allege a proper constitutional violation – in particular, (1) Plaintiff voluntarily consented

to the search of the Residence or, alternatively, the search was legally permissible based on the

emergency aid doctrine; (2) the manner of the search was reasonable based on the facts and

circumstances presented to the offices; and (3) the damage to the Residence was not

unnecessarily destructive.  *See id*.  Questions abound regarding these considerations, preventing

the entry of summary judgment on these points in Defendants' favor.

i.      **Plaintiff's Consent**

When relying upon the consent exception, the Government bears the burden of proving

that it had consent and that the consent was freely and voluntarily given.  *See United States v.*

*Patayan Soriano*, 361 F.3d 494, 501 (9th Cir. 2003).  Voluntary consent cannot be "the result of

duress or coercion, express of implied."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973).

Whether consent to a search was voluntary or was the product of duress or coercion is a question

of fact to be determined from the totality of the circumstances.  *See id*. at 248-49; *see also United*

---

[9]  The Court agrees with Defendant that the Caldwell Police Department and the
individual defendants in their official capacity are not proper parties to § 1983 actions and should
be dismissed.  *See* Mem. in Supp. of Defs.' Cross MSJ, p. 14, n.4 (Docket No. 33, Att. 1) (citing
*Vance v. County of Santa Clara*, 928 F. Supp. 993, 995-96 (N.D. Cal. 1996); *Muth v. Anderson*,
2012 WL 2525574, *4, n.4 (D. Idaho 2012)).  Defendants' Cross Motion for Summary Judgment
is therefore granted in these respects.

*States v. Al-Azzawy*, 784 F.2d 890, 895 (9th Cir. 1985) ("Voluntariness is a question of fact to be determined from all the surrounding circumstances").

Here, one conclusion could be that police officers effectively seized the Residence when Plaintiff returned from registering her son at school; the Residence was surrounded by five uniformed officers who had established a perimeter; Detective Richardson stopped Plaintiff on the street and engaged her in a conversation about Mr. Salinas and his whereabouts; Plaintiff was originally equivocal about whether Mr. Salinas was in the Residence; and Detective Richardson indicated to Plaintiff that she could get in trouble for harboring a felon. *See supra*. Under these circumstances, coupled with what Detective Richardson did/did not say to Plaintiff by way of what a search of the Residence might entail, it cannot be said as a matter of law that Plaintiff's consent to have the Residence searched was wholly voluntary and not coerced. Thus, there is a question whether Plaintiff, in fact, consented to have the Residence searched.

### ii.    Emergency Aid Exception

Even if consent was not voluntary, Defendants contend that the search was constitutionally sound under the emergency aid exception to the warrant requirement of the Fourth Amendment. *See* Mem. in Supp. of Defs.' Cross MSJ, p. 20 (Docket No. 33, Att. 1). The exception requires that: (1) law enforcement must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property; (2) the search must not be primarily motivated by intent to arrest and seize evidence; and (3) there must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched. *See Campbell v. Sarrazolla*, 2006 WL 2850481, *6 (D. Idaho 2006) (citing *United States v. Stafford*, 416 F.3d 1068, 1073-74 (9th Cir. 2005)); *see also United States v. Shook*, 2013 WL 2354085, *2 (D. Idaho 2013) (emergency aid exception applies when "officers 'have an objectively reasonable basis for concluding that there

is an immediate need to protect others or themselves from serious harm.'") (quoting *Sims v. Stanton*, 706 F.3d 954, 960 (9th Cir. 2013)). The exception stems from police officers' community caretaking function, and courts consider whether or not the emergency aid exception applies based on the totality of the circumstances. *See Stafford*, 416 F.3d at 1074; *see also United States v. Bradley*, 321 F.3d 1212, 1214 (9th Cir. 2003). The emergency aid exception is "'narrow' and [its] boundaries are 'rigorously guarded' to prevent any expansion that would unduly interfere with the sanctity of the home." *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009) (quoting *United States v. Stafford*, 416 F.3d 1068, 1073 (9th Cir. 2005)).

Here, Defendants aver that "the officers had an objectively reasonable basis for believing that there was a need to protect individuals in the home." Defendants say that Mr. Salinas had a firearm in his possession and that he was suicidal. Mem. in Supp. of Defs.' Cross MSJ, p. 21 (Docket No. 33, Att. 1) (relatedly arguing that, in this light, "the scope and manner of the search was reasonable"). However, it is not clear that Defendants' alleged effort to "protect individuals" (including Salinas) squares with the execution of the SWAT Team's tactical plan generally, or with shooting multiple tear gas canisters into the Residence through windows, doors, and walls specifically – in other words, Defendants' actions are more consistent with forcefully apprehending Mr. Salinas rather than protecting others or, even, himself. Such factual discrepancies cannot be resolved as a matter of law. *See, e.g.*, *Bonivert v. City of Clarkston*, 2018 WL 1045602, *9 (9th Cir. 2018) ("The facts matter, and here, there are at least triable issues of fact as to whether 'violence was imminent,' and whether warrantless entry was justified under the emergency aid exception.") (quoting *Ryburn v. Huff*, 565 U.S. 469, 477 (2012)).

### iii.    Reasonableness of Search

Whether the Defendants' search of the Residence was reasonable (and, relatedly, whether the damage to the Residence was not unnecessarily destructive) has already been addressed in

the context of Plaintiff's Motion for Summary Judgment. Again, the constellation of facts informing either of these questions is for the fact-finder to resolve. *See supra* (citing *Hagar*, 2012 WL 827068 at *3 ("Whether the damage alleged by Plaintiff is unreasonable . . . is a question of fact best left for the jury to decide with the benefit of the full record.")). With all this in mind, whether Plaintiff has alleged a proper constitutional violation in the first instance to support her underlying Fourth Amendment claims remains unanswered. Defendants' Cross Motion for Summary Judgment is therefore denied in this respect.

    b. *Qualified Immunity*

  Qualified immunity shields government officials performing discretionary functions from civil liability if their actions were objectively reasonable in light of clearly established law at the time they acted. *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). The Supreme Court has laid out a two-pronged inquiry for determining whether a public official enjoys qualified immunity: (1) the trial court examines the facts alleged in the light most favorable to the plaintiff and determines whether the officer's alleged conduct violated a constitutional right, and (2) the court decides whether that right was clearly established at the time of the alleged violation. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). The court may choose which of the two prongs to address first. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 553 U.S. at 202; *see also Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand" that his conduct violates that right). On the other hand, if an official's alleged conduct violated a clearly established right of which a reasonable officer would have known, he is not entitled to qualified immunity. *See id*. Applying this standard, Defendants argue that the Defendant officers are

entitled to qualified immunity.  *See* Mem. in Supp. of Defs.' Cross MSJ, pp. 27-32 (Docket No. 33, Att. 1).

### i.        Detective Richardson

As to Detective Richardson, Defendants argue, first, that Plaintiff cannot establish a constitutional claim against him because he obtained a voluntary consent, and, second, the right was not clearly established in any event.  *See id*. at p. 29.  However, this argument fails because the voluntariness of Plaintiff's consent involves disputed issues of fact, such that a constitutional deprivation *could have* occurred.  *See supra*.  And, if true, the legal contours of that alleged deprivation is so clearly established that a reasonable officer in the same situation would be aware of the consequences of a warrantless search absent a recognized exception (in this case, voluntary consent).  The Cross Motion for Summary Judgment is therefore denied in this respect.

### ii.        Swat Team Commander Seevers and SWAT Team Leader Winfield

As to SWAT Team Commander Seevers and SWAT Team Leader Winfield, Defendants argue that they committed no constitutional violation because the tactical plan they developed and carried out was reasonable and that, even if not, any constitutional right was not clearly established.  *See* Mem. in Supp. of Defs.' Cross MSJ, pp. 30-31 (Docket No. 33, Att. 1).  The involvement of these individual is multifaceted, and difficult to parse in a qualified immunity setting.  On the one hand, they received information that prompted the tactical plan's generation in the first place, including, importantly, the fact that Plaintiff had apparently consented to the search and that no search warrant was needed.  *See supra*.  In this setting, any question that otherwise might call into question the validity of Plaintiff's consent does not reach to these individual Defendants – indeed, they would not have been on notice that anything was amiss leading up to their involvement with the subsequent tactical plan.  Hence, any constitutional

violation was not so clearly established that qualified immunity protections would not apply to them specifically. Defendants' Cross Motion for Summary Judgment is therefore granted in this limited respect.[10]

However, on the other hand, where the reasonableness of the search itself is at issue (*see supra*), qualified immunity would not apply. It is well-established that a search or seizure may be invalid if carried out in an unreasonable fashion. *See id.* (citing *Franklin*, 31 F.3d at 876); *see also Davis v. United States*, 854 F.3d 594, 601 (9th Cir. 2017) (holding officers are not entitled to qualified immunity as matter of law where genuine issues of material fact exist regarding whether seizure was reasonable); *see also, e.g.*, *McCloskey v. Courtnier*, 2012 WL 646219, *3 (N.D. Cal. 2012) ("[B]ecause the facts relevant to the issue of qualified immunity are inextricably intertwined with the disputed facts relevant to the issue of excessive force, defendants are not entitled to summary adjudication on the issue of qualified immunity."). Defendants' Cross Motion for Summary Judgment is therefore denied in this respect.

### iii. Chief Allgood

Defendants contend that Chief Allgood's involvement "was limited to arriving at the scene after police officers started executing the tactical plan and assisting with securing the home after it was cleared," and that he "made no decisions with regard to the search of the home." Mem. in Supp. of Defs.' Cross MSJ, p. 32 (Docket No. 33, Att. 1). Therefore, because his was not involved in the search of the Residence, Defendants argue that Plaintiff cannot establish a constitutional violation against him and/or he is entitled to qualified immunity. *See id.* Plaintiff concedes this point, and agrees to dismiss her Unreasonable Search claim (First Claim for Relief)

---

[10] To be clear, the Court has not located any case law (and Plaintiff has not pointed to any) obligating these Defendants under the circumstances present here to either separately secure Plaintiff's consent to enter the Residence via the tactical plan or question the fact of Plaintiff's alleged consent as relayed by others before developing and carrying out the tactical plan.

against him.  *See* Opp. to Defs.' Cross MSJ, p. 14 (Docket No. 34).  Defendants' Cross Motion for Summary Judgment is granted in this respect.

Even so, Plaintiff contends that qualified immunity is *not* available to Chief Allgood concerning her Unreasonable Seizure claim (Second Claim for Relief), arguing that (1) the Residence was destroyed and, thus, unconstitutionally seized; and (2) that Chief Allgood, as "the final policy maker with respect to remediating that issue," may have unreasonably interfered with her possessory interest in the Residence and its contents in the two months it took to make the Residence habitable again.  *See id.* at pp. 14-16.  This is not enough.  If Plaintiff intends to raise a constitutional claim against Chief Allgood insofar as he allowed the City of Caldwell's insurance provider to work with the Residence's owner and the owner's insurance provider to complete the repairs to the Residence, she fails to then identify how his actions violated a constitutional right in the first instance, or how that right was clearly established at the time of any such violation.  The Cross Motion for Summary Judgment is also granted in this respect.

       *c.*     *Monell Claims*

Plaintiff asserts that Defendant City of Caldwell is liable for the alleged Fourth Amendment violations – Unreasonable Search (First Claim for Relief) and Unreasonable Seizure (Second Claim for Relief).  Generally, a governmental entity "may not be sued under § 1983 for an injury inflicted solely by its employees or agents."  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).  To succeed on a claim against a governmental entity under § 1983, a plaintiff must allege "(1) that [the plaintiff] possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation."  *Doughterty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).  Defendants argue the Plaintiff is unable to establish any of the requisite elements of a

*Monell* claim against the City of Caldwell because (1) the search of the Residence did not violate a constitutional right, and, regardless, (2) Plaintiff has not identified any custom or policy that was deliberately indifferent to her Fourth Amendment rights. *See* Mem. in Supp. of Defs.' Cross MSJ, pp. 32-34 (Docket No. 33, Att. 1).

To begin, owing to the issues of fact surrounding the existence of a constitutional violation (*see supra*), Plaintiff's *Monell* claims against the City of Caldwell will not be dismissed as a matter of law on this discrete basis. Therefore, Defendants' additional arguments speaking to the City of Caldwell's policies and procedures vis à vis Plaintiff's *Monell* claims are scrutinized here. To this end, Plaintiff argues that, (1) as to her Unreasonable Seizure claim (Second Claim for Relief), the City of Caldwell "failed to adopt a policy and/or train personnel on how to address and remediate destruction of personal property, thereby rendering such destruction an unreasonable seizure"; and (2) as to her Unreasonable Search claim (First Claim for Relief), the City of Caldwell's policies are inadequate and its final decision/policy maker, SWAT Team Commander Seevers, "ratified the conduct of the 'search' based on an invalidly-obtained consent." Opp. to Defs.' Cross MSJ, pp. 17-18 (Docket No. 34). Plaintiff's arguments are taken in turn and, for the reasons that follow, are not meritorious.

First, following the search/seizure, the City of Caldwell and/or the Caldwell Police Department secured the Residence from theft; informed its insurance carrier of the situation; the insurance carrier worked with the Residence's owner, the owner's insurance carrier, and Disaster Kleenup to repair the Residence; and Plaintiff was reimbursed for her damaged property. *See* Reply in Supp. of Cross MSJ, p. 10 (Docket no. 38). That Plaintiff may have been dissatisfied with the time it took to make repairs or compensate her for her destroyed property, but any unhappiness she may have about the time involved – at least on this record – does not mean that the procedures undertaken in those respects amounted to a custom or policy that was deliberately

indifferent to her Fourth Amendment rights. Perhaps there is a claim for some sort of relief on such facts, but whatever it might be, it is not a Fourth Amendment claim against the City of Caldwell under *Monell*. The Cross Motion for Summary Judgment is granted in this respect and Plaintiff's Unreasonable Seizure claim (Second Claim for Relief) against the City is dismissed.

Second, to simply state – as Plaintiff does – that the City of Caldwell's policies are inadequate is not enough. In such a vacuum, it is impossible to examine whether, as applied, the City was either deliberately indifferent to Plaintiff's constitutional rights, or the moving force behind the alleged constitutional violation. And, to argue – as Plaintiff does – that SWAT Team Commander Seevers somehow ratified the search's particulars by developing the tactical plan despite Plaintiff's alleged coerced consent, ignores the fact that he was not aware of the circumstances surrounding Plaintiff's consent. From his perspective, she did consent. *See supra* (discussing applicability of qualified immunity to SWAT Team Commander Seevers's conduct). Moreover, aside from developing the tactical plan, there is no evidence that SWAT Team Commander Seevers makes final *policy* on behalf of the City. Defendants' Cross Motion for Summary Judgment is also granted in this respect and Plaintiff's Unreasonable Search claim (First Claim for Relief) against the City of Caldwell is dismissed.

**B.    Plaintiff's Miscellaneous Motions (Docket Nos. 24, 35 & 36)**

1.    <u>Plaintiff's Motion in Limine to Prohibit Both the Display of Fabian Salinas's Photograph and Any Mention of His Criminal History at Trial (Docket No. 24)</u>

Plaintiff requests that Defendants be prevented from (1) discussing in front of the jury the criminal history of Mr. Salinas, as well as (2) publishing to the jury any photographs of Mr. Salinas. *See generally* Mem. in Supp. of Mot. in Limine (Docket No. 24, Att. 1). To date, Defendants have not submitted a substantive response to the Motion, arguing that "the scope of a potential trail and the specific issues to be presented at trial have not yet been determined." Opp.

to Mot. in Limine, p. 2 (Docket No. 28). Per Defendants, "[w]ithout having this knowledge, the relevancy of such evidence for trial purposes cannot be currently ascertained." *Id.*

The Court agrees with Defendants. Plaintiff's Motion in Limine is denied, without prejudice to renew following the issuance of an order setting trial and, therein, a briefing schedule for motions in limine is included. Without now deciding the issue, the Court is generally inclined to consider Mr. Salinas's criminal history relevant in the context of understanding the reasonableness of Defendants' conduct with respect to searching the Residence; at the same time, the Court is struggling to understand the appropriate relevance of the photographs, if any. To the extent the Motion is renewed, the parties' briefing should address these particular points.

  2.  <u>Plaintiff's (1) Motion to Strike Three Facts Relying on Sheriff Raney's Expert Witness Disclosures in Support of Defendants' Brief (Docket No. 35), and (2) Motion to Strike from Defendants' Statement of Facts, Response Brief, and Cross Motion for Summary Judgment References to Information Police Knew but Did Not Share with Shaniz West (Docket No. 36)</u>

Both Motions attack Defendants' characterization of certain "facts" and arguments in the context of the underlying Cross Motions for Summary Judgment. For example, in the first Motion to Strike, Plaintiff moves to strike from Defendants' Statement of Facts, three "facts" that were extrapolated from the expert report of Sheriff Gary Raney, including: (1) "Police officers did not use any coercive techniques in obtaining West's consent"; (2) "The tactical plan developed by Doug Winfield was reasonable and conformed with commonly accepted police practices"; and (3) "All policies were designed to protect an individual's constitutional rights. All policies in effect were properly formulated and sufficient to guide police practices." Mem. in Supp. of Mot. to Strike Three Facts, p. 3 (Docket No. 35, Att. 1).

Similarly, in the second Motion to Strike, Plaintiff moves to strike information known to police, but not to Plaintiff (Mr. Salinas's criminal history, ongoing investigations, prior

interactions with the police, and information reported by third parties to the police) "because it has a tendency to confuse the issues presented on a motion for summary judgment" and because "all issues involved in the current cross motions for summary judgment are to be decided based on what a reasonable person, standing in the shoes of Ms. West, would have believed or understood under a totality of the circumstances." Mem. in Supp. of Mot. to Strike Info. Not Shared with West, p. 2 (Docket No. 36, Att. 1).

As indicated during oral argument on the pending motions, Plaintiff's arguments in these respects are folded into the Court's consideration of the Cross Motions for Summary Judgment and do not deserve piecemeal consideration/resolution here; rather, they are to be weighed alongside the parties' arguments on summary judgment. In doing so, and resolving here that issues of fact exist on the questions of (1) the voluntariness of Plaintiff's consent, and (2) the reasonableness of the Residence's search, both Motions to Strike are denied as moot.

### III.   ORDER

Based on the foregoing, IT IS HEREBY ORDERED that:

1.    Plaintiff's Motion for Summary Judgment (Docket No. 29) is DENIED.

2.    Defendants' Cross Motion for Summary Judgment (Docket No. 33) is GRANTED, in part, and DENIED, in part, as follows:

   a.    Plaintiff's claims against the Caldwell Police Department and the individual defendants in their official capacity are dismissed. In this respect, Defendants' Cross Motion for Summary Judgment is GRANTED.

   b.    Plaintiff did not fail to allege a proper constitutional violation as a matter of law. In this respect, Defendants' Cross Motion for Summary Judgment is DENIED.

   c.    As to Detective Richardson, qualified immunity does not apply. In this respect, Defendants' Cross Motion for Summary Judgment is DENIED.

d.       As to SWAT Team Commander Seevers and SWAT Team Leader Winfield, qualified immunity applies to the extent their conduct is premised upon Plaintiff's allegedly coerced consent.  In this respect, Defendants' Cross Motion for Summary Judgment is GRANTED.  However, qualified immunity does apply to these individual Defendants to the extent their conduct is premised upon the development of the tactical plan itself and the tactical plan's execution.  In this respect, Defendants' Cross Motion for Summary Judgment is DENIED.

e.       As to Chief Allgood, qualified immunity applies.  In this respect, Defendants' Cross Motion for Summary Judgment is GRANTED.

f.       Plaintiff's *Monell* claims against the City of Caldwell are dismissed.  In this respect, Defendants' Cross Motion for Summary Judgment is GRANTED.

3.       Plaintiff's Motion in Limine to Prohibit Both the Display of Fabian Salinas's Photograph and Any Mention of His Criminal History at Trial (Docket No. 24), is DENIED, without prejudice.

4.       Plaintiff's Motion to Strike Three Facts Relying on Sheriff Raney's Expert Witness Disclosures in Support of Defendants' Brief (Docket No. 35) is DENIED as moot.

5.       Plaintiff's Motion to Strike from Defendants' Statement of Facts, Response Brief, and Cross Motion for Summary Judgment References to Information Police Knew but Did Not Share with Shaniz West (docket No. 36) is DENIED, as moot.

///

///

///

///

///

///

6.     **Pursuant to the previously entered Case Management Order, mediation shall take place within 30 days of this Memorandum Decision and Order.  The parties shall contact ADR Coordinator Keith Bryan at (208) 334-9067 for assistance, if needed**.

DATED: March 28, 2018

_____
Ronald E. Bush
Chief U.S. Magistrate Judge